**POPCAP GAMES, INC.,**
**Appellant/Cross–**
**Appellee,**

v.

**MUMBOJUMBO, LLC, MumboJumbo Distribution, LLC f/k/a Texas United Distribution, LLC, Jay DiNucci, and Mark Cottam, Appellees/Cross–Appellants,**

and

**Strategic Marketing Partners, Inc., Appellee.**

No. 05–10–00301–CV.

Court of Appeals of Texas, Dallas.

Aug. 31, 2011.

Rehearing Overruled Nov. 3, 2011.

Ben Taylor, Jason Keith Fagelman, Michael A. Swartzendruber, Oscar Rey Rodriguez, Fulbright & Jaworski L.L.P., Dallas, for Appellant/Cross–Appellee.

Martin E. Rose, Steven Dominic Sanfelippo, Michael D. Richardson, Michael Ross Cunningham, Mary Elizabeth Hosea Lemoine, Rose Walker, L.L.P., Dallas, for Appellees/Cross–Appellants.

William Roberts Pace, Jonathan A. Pace, Pace & Pace, LLP, Dallas, for Appellee.

Before Justices MORRIS, MOSELEY, and FITZGERALD.

## OPINION

Opinion By Justice FITZGERALD.

This appeal arises from commercial litigation in which the parties asserted several claims and counterclaims against each other. After a jury trial on the merits and a hearing before the trial judge on attorneys' fees, the trial judge signed a judgment awarding MumboJumbo, LLC ("MumboJumbo") roughly $6.7 million in damages and fees against PopCap Games, Inc. ("PopCap"). The judgment also ordered PopCap to take nothing on its claims. PopCap appealed, and four other parties later filed a cross-notice of appeal. We reverse, render judgment that MumboJumbo take nothing, render judgment that PopCap recover $1,557,618.15 from MumboJumbo, and remand for determination of PopCap's attorneys' fees, interest, and costs of court.

### I. BACKGROUND

#### A. Facts

PopCap is a developer of computer-game software. MumboJumbo both develops computer-game software itself and distributes computer games developed by others. Some evidence indicates the two companies started a business relationship in 2002.

In 2005, PopCap and MumboJumbo executed a written retail license agreement in which PopCap granted MumboJumbo, among other things, an exclusive North American license to manufacture, market, and distribute specified computer games. The 2005 agreement went into effect July 1, 2005. The 2005 agreement had a three-year term, but it also provided that either party could terminate the agreement without cause upon 120 days' written notice.

On May 23, 2006, PopCap sent MumboJumbo a notice terminating the 2005

agreement, effective 120 days later. In the summer of 2006, the parties executed a new written agreement, entitled "Game Retail Distribution Agreement," with an effective date of July 1, 2006 and an expiration date of March 31, 2008. This 2006 agreement expressly terminated the 2005 agreement effective June 30, 2006. Under the 2006 agreement, MumboJumbo was to provide certain services to PopCap with respect to the manufacture, sale, distribution, and invoicing of specified PopCap computer games. The 2006 agreement specified the fees that PopCap was to pay MumboJumbo for the various services. The 2006 agreement also required Mumbo-Jumbo to pay PopCap on a monthly basis, in an amount based on the revenues MumboJumbo collected for the sale of PopCap games.

The parties' relationship soured in mid–2007. PopCap began meeting directly with computer-game retailers with the assistance of another company, Strategic Marketing Partners, Inc. ("SMP"). Pop-Cap also started distributing its games to at least one retailer, Walmart, without MumboJumbo's involvement. Mumbo-Jumbo contends that PopCap's actions breached the 2006 agreement. Mumbo-Jumbo also contends that PopCap committed fraud from about December 2006 through March 2007, both by telling MumboJumbo that PopCap was not going to start selling its products directly to retailers and by failing to disclose its true intentions to MumboJumbo. PopCap contends that MumboJumbo breached its payment obligations under the 2006 agreement by making some payments late and by failing to pay some amounts entirely.

## B. Procedural history

In October 2007, MumboJumbo and Texas United Distribution, LLC sued Pop-Cap, PopCap Games International, Ltd., and SMP in Dallas County district court for tortious interference with contractual relations and business disparagement. MumboJumbo also sought a declaratory judgment as to the parties' duties under the 2006 agreement. Two weeks later, PopCap and PopCap Games International, Ltd. filed their own breach-of-contract lawsuit against MumboJumbo in a different Dallas County district court. Soon thereafter, the PopCap case was transferred by agreement to the district court in which the MumboJumbo case was pending. The district judge then signed an order consolidating the PopCap case into the Mumbo-Jumbo case and aligning the parties as follows: (1) PopCap and PopCap Games International, Ltd. were aligned as plaintiffs/counterdefendants, (2) MumboJumbo was aligned as defendant/counterplaintiff, (3) Texas United Distribution, LLC was aligned as counterclaim intervenor, and (4) SMP was aligned as counterclaim defendant.

PopCap added two more defendants, MumboJumbo executives Jay DiNucci and Mark Cottam, during the pretrial phase of the case. The parties amended their pleadings several times. At the time of trial, the live pleadings raised the following claims. PopCap and PopCap Games International, Inc. sued MumboJumbo for breach of contract, conversion, quantum meruit, and unjust enrichment. They also sued MumboJumbo, DiNucci, and Cottam for fraud. MumboJumbo and Mumbo-Jumbo Distribution, LLC (formerly known as Texas United Distribution, LLC) sued PopCap, PopCap Games International, Inc., and SMP for breach of contract, tortious interference with existing and prospective contractual relations, business disparagement, and fraud. They also sought a declaratory judgment concerning the parties' rights and duties under the 2006 agreement. Both sides sought compensatory damages, punitive damages, and

attorneys' fees. MumboJumbo and MumboJumbo Distribution, LLC eventually nonsuited their claims against SMP.

The case was tried to a jury, except that the parties agreed to try attorneys' fees to the court after the jury verdict. No jury questions were submitted as to PopCap Games International, Ltd., MumboJumbo Distribution, LLC f/k/a Texas United Distribution, LLC, DiNucci, or Cottam. The jury found that MumboJumbo breached the 2006 agreement, but it found that MumboJumbo's breach was excused by PopCap's prior breach. Accordingly, the jury made no finding of PopCap's breach-of-contract damages. The jury next found that PopCap breached the 2006 agreement, that PopCap's breach was not excused, and that MumboJumbo's breach-of-contract damages were $776,648. The jury found that PopCap intentionally interfered with MumboJumbo's contract with Walmart, but it awarded MumboJumbo zero damages on that claim. Finally, the jury found that PopCap committed fraud by misrepresentation and fraud by nondisclosure against MumboJumbo, and it awarded MumboJumbo $3.8 million in damages as "sunk costs," defined as the amount MumboJumbo expended that it would not have expended if the fraud had not occurred. No other claims were submitted to the jury. The trial judge then held a hearing at which MumboJumbo presented additional evidence in support of its claim for attorneys' fees.

PopCap filed a motion to disregard and for judgment notwithstanding certain jury findings. On March 1, 2010, the trial judge denied PopCap's motion and signed a final judgment awarding MumboJumbo the following sums to be recovered from PopCap: (1) $4,576,648 in damages, (2) $2,148,948 in attorneys' fees for preparation and trial, (3) prejudgment interest of $515,343.10, and (4) postjudgment interest and costs of court. The judgment also awarded MumboJumbo conditional attorneys' fees in various amounts in the event of specified postjudgment actions by PopCap. The judgment ordered PopCap to take nothing on its claims.

PopCap filed a notice of appeal on March 12, 2010. On March 29, 2010, MumboJumbo filed a "Motion for New Trial on Damages." The trial judge denied that motion by written order signed April 20, 2010. On May 20, 2010, MumboJumbo, MumboJumbo Distribution, LLC, DiNucci, and Cottam filed a joint "Cross Notice of Appeal."

## II. POPCAP'S APPEAL

PopCap raises seven issues on appeal. In its first issue, PopCap argues that we should reverse the take-nothing judgment against it, render judgment in its favor in the amount of roughly $1.5 million, and remand for further proceedings on its claim for attorneys' fees. In its second issue, PopCap argues that we should reverse the judgment in favor of MumboJumbo on its fraud and breach-of-contract counterclaims and render judgment that MumboJumbo take nothing. Because PopCap's first two issues are dispositive, we need not summarize its other issues.

## A. Sufficiency of the evidence that PopCap breached the 2006 agreement

Common to both of PopCap's first two issues on appeal is the question of whether there is legally sufficient evidence to support the jury's finding that PopCap breached the 2006 agreement. When an appellant attacks the legal sufficiency of the evidence to support an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that no evidence supports the finding. *Hoss v. Alardin*, 338 S.W.3d 635, 640 (Tex.App.-

Dallas 2011, no pet.). The evidence is legally sufficient if it is sufficient to enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). In conducting our review, we view the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *Id.* at 822.

As framed by the parties, the question of whether PopCap breached the 2006 agreement is one of contractual interpretation. Evidence supports MumboJumbo's contention that, during roughly the April–July 2007 time frame, PopCap entered a sales representation agreement with SMP and began to market its games to Walmart and other retailers without MumboJumbo's involvement. The question is whether PopCap's conduct breached the 2006 agreement.

## 1. The language of the 2006 agreement

The 2006 agreement provides that the parties' rights and duties would change over time. The first period defined by the agreement was Phase I, from July 1, 2006 through March 31, 2007. Phase II extended from April 1, 2007 through the end of the agreement on March 31, 2008. Additionally, the agreement defines "a transition period commencing January 1, 2007 and ending April 1, 2007" as the "Transition Period" during which certain special contractual rights and duties would apply. We quote the pertinent contract provisions, in which "MJ" refers to MumboJumbo and "PopCap" refers collectively to PopCap Games, Inc. and PopCap Games International, Ltd.:

> 2.1 MJ Obligations during Phase I: PopCap hereby appoints MJ, during Phase I only, as its exclusive provider of the Services with respect to sales of Authorized Product(s) at all Channel Outlets in the Territory on the terms set forth herein. . . .

> . . .

> 4. PopCap may, at its option, engage MJ during Phase II, to provide such Services, in the manner as specified in Section 4.2 below, as PopCap may desire from time to time in its sole discretion, with respect to sales of Games at any one or more of the Channel Outlets in the Territory on the terms set forth herein; provided that MJ shall have the absolute right to decline such engagement if the Services for any particular Channel Outlet for which PopCap wishes to engage MJ do not include Sales Services.

> 4.1 *Transition Period.* During a transition period commencing January 1, 2007 and ending April 1, 2007 (the "Transition Period"), MJ and PopCap shall work cooperatively to implement a transition of Channel Outlet accounts selected by PopCap in its sole discretion from Direct MJ Accounts to Direct PopCap Accounts.

> 4.2 *Services.* During Phase II, MJ shall provide the Services in accordance with the terms and conditions of this Agreement and the applicable Exhibits. PopCap shall take commercially reasonable efforts to give MJ at least sixty (60) days prior notice with respect to the engagement of MJ to provide Services, subject to Section 4, with respect to an account during Phase II. Notwithstanding anything to the contrary contained herein, the parties agree that during the Transition Period certain Channel Outlet accounts may be taken over by PopCap (herein "Transition Account"), provided that notwithstanding the Services thereafter rendered by MJ with respect to such Transition Account, MJ shall nevertheless receive

Fees (as defined below) on Authorized Products thereafter sold to such Transition Account prior to the expiration of Phase I equal to the greater of the Sales Fee or the total Fees due to MJ for the particular Services rendered by MJ for such Transition Account. The agreement defines "Services" to mean "Sales Services, Manufacturing Services, Distribution Services and/or Invoicing Services, as applicable." The agreement defines those terms generally in accordance with their ordinary meanings, e.g., "Distribution Services" means distribution services such as warehousing, shipping, and processing of returns. "Channel Outlets" are "physical retail sales outlets" from which customers buy packaged versions of PopCap games.

**2. Interpretation of the 2006 agreement**

PopCap argues that during Phase II of the 2006 agreement it was free to hire other service providers such as SMP and to market its computer games to retailers without MumboJumbo's involvement. MumboJumbo argues that PopCap was obliged to keep MumboJumbo as its exclusive service provider during Phase II for all accounts that PopCap did not take over during the Transition Period. Because PopCap did not take over any accounts during the Transition Period, MumboJumbo concludes, PopCap's conduct breached the agreement.

■■■ The threshold question is whether the agreement is ambiguous. If it is ambiguous, its meaning was a question of fact for the jury. *See Arredondo v. City of Dallas*, 79 S.W.3d 657, 667 (Tex.App.-Dallas 2002, pet. denied). If it is not ambiguous, we determine the agreement's meaning as a question of law. *El Paso Prod. Co. v. Geomet, Inc.*, 228 S.W.3d 178, 180 (Tex.App.-Dallas 2007, pet. denied). Whether a contract is ambiguous is a ques-

tion of law for the court to decide by considering the contract as a whole in light of the circumstances existing when the contract was made. *Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Ass'n*, 205 S.W.3d 46, 56 (Tex.App.-Dallas 2006, pet. denied). A contract is ambiguous if it is susceptible to more than one reasonable interpretation after we apply the relevant rules of construction. *Id.* We may conclude a contract is ambiguous even if, as in this case, neither side pleaded that the agreement is ambiguous or argues to us that the agreement is ambiguous. *See id.* At the same time, the fact that parties advance different interpretations of a contract does not necessarily mean that the contract is ambiguous. *See Royal Maccabees Life Ins. Co. v. James*, 146 S.W.3d 340, 346 (Tex. App.-Dallas 2004, pet. denied).

We conclude that PopCap's interpretation of the 2006 agreement is reasonable and that MumboJumbo's interpretation is unreasonable. Because the agreement has only one reasonable interpretation, it is not ambiguous, and we construe it as a matter of law.

■■■ We agree with PopCap that the 2006 agreement gave MumboJumbo the right to be PopCap's exclusive provider of contractually defined "Services" only during Phase I. That is the only reasonable reading of section 2.1, which states, "PopCap hereby appoints MJ, **during Phase I only, as its exclusive provider of the Services** with respect to sales of Authorized Product(s) at all Channel Outlets in the Territory...." (Emphasis added.) As to Phase II, the agreement imposes no such limitation on PopCap and confers no such right on MumboJumbo. Rather, section 4 states, "**PopCap may, at its option, engage MJ during Phase II,** to provide such services, in the manner as specified in

Section 4.2 below, *as PopCap may desire from time to time in its sole discretion,* with respect to sales of Games at any one or more of the Channel Outlets in the Territory...." (Emphases added.) The use of different language in different parts of a contract generally means that the parties intended different things. *See Mr. W Fireworks, Inc. v. Ozuna,* No. 04–08–00820–CV, 2009 WL 3464856, at *7 (Tex. App.-San Antonio Oct. 28, 2009, pet. denied) (mem. op.). The difference between section 2.1 and section 4 is plain: the former makes MumboJumbo PopCap's exclusive service provider during Phase I, and the latter contains no exclusivity language and gives PopCap the sole discretion to engage MumboJumbo for any services or none at all during Phase II. Thus, we conclude that MumboJumbo's exclusive rights were limited to Phase I, and that PopCap was contractually free to deal with whomever it wanted during Phase II—MumboJumbo, other service providers, or directly with retailers themselves.

We reject MumboJumbo's competing interpretation as unreasonable. MumboJumbo contends that PopCap's right to use another service provider or contact retailers directly itself was limited to the Transition Period, and that at the end of the Transition Period MumboJumbo again became PopCap's exclusive service provider as to any retail accounts not taken away from MumboJumbo during the Transition Period. MumboJumbo points out that nothing in the agreement expressly authorizes PopCap to "disengage" MumboJumbo after it engaged MumboJumbo during Phase II. But even if PopCap engaged MumboJumbo to service retail accounts at the beginning of Phase II, nothing in the agreement precluded PopCap from also using other service providers or dealing directly with retailers during Phase II. And interpreting the agreement to preclude PopCap from using other providers or dealing directly with retailers during Phase II would be unreasonable in light of the contractual provision that PopCap appointed MumboJumbo as its exclusive service provider "during Phase I only."

MumboJumbo argues that PopCap's interpretation renders the Transition–Period provisions meaningless, which would run afoul of the usual rules of contract construction. *See Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). Specifically, MumboJumbo relies on the following passage from section 4.2: "[T]he parties agree that *during the Transition Period* certain Channel Outlet accounts may be taken over by PopCap...." (Emphasis added.) MumboJumbo contends that this passage is rendered meaningless if PopCap could also take accounts over during Phase II of the agreement. We disagree. The quoted passage is part of a longer sentence that makes its meaning clear:

> Notwithstanding anything to the contrary contained herein, the parties agree that during the Transition Period certain Channel Outlet accounts may be taken over by PopCap (herein "Transition Account"), provided that notwithstanding the Services thereafter rendered by MJ with respect to such Transition Account, MJ shall nevertheless receive Fees (as defined below) on Authorized Products thereafter sold to such Transition Account prior to the expiration of Phase I equal to the greater of the Sales Fee or the total Fees due to MJ for the particular Services rendered by MJ for such Transition Account.

That is, during the Transition Period, PopCap could take over certain accounts, but MumboJumbo was still entitled to get paid a defined fee without regard to the services (if any) it actually provided on those accounts during the remainder of Phase I.

Thus, the Transition Period differs both from the earlier part of Phase I, during which MumboJumbo was PopCap's exclusive provider of services, and from Phase II, during which PopCap could opt to use MumboJumbo's services or not as to any accounts.

According to MumboJumbo, PopCap's interpretation is unreasonable because under that interpretation PopCap could do whatever it wanted, whenever it wanted, after Phase I expired, and thus the contract was meaningless after Phase I. We reject this argument. During Phase I, the 2006 agreement gave MumboJumbo exclusive rights, thus reducing PopCap's flexibility. During Phase II, the balance of rights and duties shifted, and PopCap enjoyed greater flexibility. This interpretation of the agreement is not unreasonable, nor does it render Phase II meaningless. Although PopCap was free to use MumboJumbo's services or not during Phase II, MumboJumbo was not entirely free to refuse PopCap's requests for services. For example, section 4.3 provides that if PopCap requested manufacturing services from MumboJumbo during Phase II, MumboJumbo "shall render" those services. MumboJumbo's obligations, however, are limited by a further proviso that MumboJumbo could decline a request if PopCap did not also retain MumboJumbo to provide "Sales Services" with respect to the particular Channel Outlet involved. Thus, the Phase II provisions of the 2006 agreement are not meaningless—they simply conferred a different set of rights and obligations as compared to the Phase I provisions.

■ Finally, MumboJumbo relies on extrinsic evidence to support its interpretation. It argues that PopCap's interpretation is unreasonable in light of evidence showing that vendors like MumboJumbo need long lead times to present and sell their product lines to retailers well in advance of the annual holiday season. MumboJumbo also cites testimony that it would make no economic sense for MumboJumbo to give PopCap, in effect, the unilateral right to terminate the contract after MumboJumbo had built the market for PopCap's products. And it cites evidence that PopCap internally considered asking MumboJumbo to extend the Transition Period, suggesting that PopCap did not believe it could deal directly with retailers during Phase II under the 2006 agreement as it stood. But if a contract is not ambiguous, we do not consider extrinsic evidence in interpreting it. *King v. Cirillo*, 233 S.W.3d 437, 440 (Tex.App.-Dallas 2007, pet. denied); *see also David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450–51 (Tex. 2008) ("Only where a contract is ambiguous may a court consider the parties' interpretation and 'admit extraneous evidence to determine the true meaning of the instrument.'") (per curiam) (citation omitted).[1]

### 3. Conclusion

The contract unambiguously permitted PopCap to use other service providers and to contact retailers directly during Phase II. MumboJumbo does not identify any act or omission by PopCap that might constitute a breach of contract other than PopCap's use of another service provider and its direct contacts with retailers during Phase II. We conclude that the jury's finding that PopCap breached the 2006 agreement is supported by legally insufficient evidence. Accordingly, the trial

---

1. Even if we may consider some of MumboJumbo's evidence as evidence of the circumstances existing when the contract was made, that evidence does not demonstrate ambigui-ty. It demonstrates only that MumboJumbo was willing to run the risks associated with Phase II in exchange for the benefits it received during Phase I.

judge erred by failing to disregard (1) the jury's finding that PopCap breached the 2006 agreement, (2) the finding that PopCap committed a material breach of the agreement before MumboJumbo did, and (3) the finding that MumboJumbo's breach-of-contract damages were $776,648. The trial judge also erred by awarding MumboJumbo its attorneys' fees.

### B. Whether PopCap proved its breach-of-contract damages by conclusive evidence

As part of its first issue on appeal, PopCap argues that the trial judge erred by failing to render judgment in favor of PopCap on its breach-of-contract claim against MumboJumbo and failing to award PopCap $1,557,618.15 as damages on that claim, plus attorneys' fees. Although the jury found that MumboJumbo breached the 2006 agreement (a finding MumboJumbo has not challenged on appeal), it did not answer the question inquiring about PopCap's damages resulting from the breach because of its finding that PopCap committed a prior material breach. PopCap moved for judgment notwithstanding the verdict on the ground that PopCap had conclusively proved damages of $1,557,618.15. The trial judge denied PopCap's request.

■■■ The test for legal sufficiency of the evidence is the same whether it is raised through a motion for directed verdict, a motion for judgment notwithstanding the verdict, or appellate no-evidence review. *City of Keller*, 168 S.W.3d at 823. When a party challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which the

party had the burden of proof, it must show that the evidence establishes as a matter of law all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex.2001) (per curiam); *Allman v. Butcher*, 314 S.W.3d 671, 673 (Tex.App.-Dallas 2010, no pet.). In our review, we must credit evidence favorable to the finding if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *City of Keller*, 168 S.W.3d at 827; *see also Wagner v. Edlund*, 229 S.W.3d 870, 874 (Tex.App.-Dallas 2007, pet. denied). If there is no evidence to support the finding, we then review the entire record to determine if the contrary proposition is established as a matter of law. *Dow Chem. Co.*, 46 S.W.3d at 241; *Allman*, 314 S.W.3d at 673. We sustain the point only if the contrary proposition is conclusively established. *Dow Chem. Co.*, 46 S.W.3d at 241; *Allman*, 314 S.W.3d at 673. Thus, the question presented is whether PopCap conclusively proved the amount of its breach-of-contract damages.[2]

PopCap's breach-of-contract claim was simply that MumboJumbo failed to pay PopCap all the money it was supposed to based on its receipts from PopCap game sales. PopCap argues that MumboJumbo's controller, Jay DiNucci, admitted that MumboJumbo owed PopCap $1,557,618.15 if PopCap did not breach the contract. DiNucci testified as follows:

Q. So as of the time [PopCap Exhibit 13] was generated and through August 15 of 2008, the total amount owed to PopCap by MumboJumbo on the sale of PopCap games was

---

**2.** There is actually no "adverse finding" for PopCap to challenge because the jury, having found that PopCap committed the first material breach of the 2006 agreement, did not answer PopCap's damages question. But be-

cause the ultimate question is whether the trial judge should have granted PopCap's motion for judgment n.o.v. on the issue of damages, ordinary legal-sufficiency standards apply.

$1,557,618.15, according to your calculations, correct?

A. If it weren't for the breach of the contract, that's the amount that we would have owed.

Q. You're talking about the contentions made by MumboJumbo in this lawsuit when you say that, correct, sir?

A. The actual breach by Mum—by PopCap.

MumboJumbo's CEO, Mark Cottam, testified similarly but without the same specificity:

Q. [D]o you admit, Mr. Cottam, but for PopCap's breach of the 2006 agreement, that MumboJumbo owes Pop-Cap roughly $1.5 million?

A. Yes, I agree to that.

PopCap also argues that MumboJumbo conceded the debt in its opening statement to the jury:

You know what? If they [PopCap] hadn't breached the contract, we would have owed them a million and a half dollars, and there's no dispute about that.

Our first inquiry is whether any evidence shows that PopCap's breach-of-contract damages were not $1,557,618.15. MumboJumbo's argument in this regard is not entirely clear. First, MumboJumbo points out that section 12.3.2 of the 2006 agreement prescribed that different payment terms would go into effect if the agreement were terminated. Then it asserts, "PopCap never introduced any evidence of what it would have made had the 2006 Agreement been terminated, which was PopCap's recourse in the case of non-payment." Thus, MumboJumbo appears to contend that PopCap could—or should—have terminated the 2006 agreement if MumboJumbo breached by failing to pay, and that if PopCap had done so, a different payment formula would have

then applied to MumboJumbo's subsequent sales of remaining PopCap inventory. But MumboJumbo does not contend that PopCap actually terminated the 2006 agreement, and there is no evidence that it did. Going beyond MumboJumbo's specific argument, our review of the record has revealed no evidence showing that Pop-Cap's breach-of-contract damages were not $1,557,618.15.

■■■■ The remaining question is whether PopCap's evidence conclusively established that its breach-of-contract damages were $1,557,618.15. Evidence is conclusive only if reasonable people could not differ in their conclusions to be drawn from the evidence. *City of Keller,* 168 S.W.3d at 816. Undisputed evidence that permits only one logical inference is conclusive evidence. *Id.* at 814. Although not all undisputed evidence rises to the level of conclusive evidence, undisputed evidence may become conclusive when a party admits it is true. *Id.* Here, we conclude that MumboJumbo admitted that PopCap's breach-of-contract damages were $1,557,618.15, conclusively proving the amount of PopCap's damages. As quoted above, MumboJumbo's director of finance Jay DiNucci testified that Mumbo-Jumbo owed PopCap that amount for the sale of PopCap games, but for PopCap's own breach of contract. We disagree with MumboJumbo's contention that DiNucci's admission was "purely hypothetical." Although DiNucci did not admit that Mum-boJumbo owed PopCap any money, he admitted that MumboJumbo would have owed PopCap exactly $1,557,618.15 if Pop-Cap had not breached the contract. There is no evidence that PopCap breached the contract. We conclude that DiNucci's undisputed testimony was conclusive evidence of the amount of PopCap's breach-of-contract damages.

We conclude that PopCap conclusively proved the amount of its breach-of-contract damages. Accordingly, the trial judge erred by denying PopCap's motion to disregard the jury's findings to the extent PopCap requested the judge to render judgment in PopCap's favor in the amount of $1,557,618.15.

## C. Sufficiency of the evidence to support the judgment against PopCap for fraud

In the remainder of its second issue on appeal, PopCap presents several arguments attacking the part of the judgment awarding MumboJumbo $3.8 million in damages for fraud. PopCap argues (1) there is legally insufficient evidence of the essential element of detrimental reliance, (2) the finding of fraud by nondisclosure is immaterial, (3) there is legally insufficient evidence that MumboJumbo suffered $3.8 million in "sunk costs" damages, and (4) there is legally insufficient evidence that the sunk-costs damages were foreseeable to PopCap. We agree with PopCap's fourth argument and conclude that MumboJumbo adduced no evidence that the sunk-costs damages found by the jury were foreseeable to PopCap.

### 1. The jury's finding and other background facts

Because the jury found that PopCap committed fraud by misrepresentation and fraud by nondisclosure against Mumbo-Jumbo, it answered Question 12 concerning fraud damages. We quote the relevant parts of Question 12 and the jury's answer:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate MumboJumbo for its damages, if any, that resulted from such fraud?
>
> "Proximate cause" means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.
>
> . . .
>
> d. Sunk costs.
>
> "Sunk costs" means the amount MumboJumbo expended that would not have been expended if such fraud had not occurred.
>
> Answer: *$3,800,000*

In its motion to disregard certain jury findings, PopCap pointed out that Question 12 did not require the jury to find proximate causation of MumboJumbo's fraud damages but instead asked the jury to find the damages that merely "resulted from" PopCap's alleged fraud. PopCap argued that this amounted to a failure to submit the essential element of proximate cause to the jury, and that the trial judge should make its own finding, pursuant to Texas Rule of Civil Procedure 279, that there was no evidence of proximate cause. The trial judge denied PopCap's motion and awarded MumboJumbo $3,800,000 as damages for PopCap's fraud.

According to MumboJumbo, the jury's finding of fraud damages was based on evidence of the money MumboJumbo spent making certain acquisitions. MumboJumbo CEO Mark Cottam testified that MumboJumbo acquired a company called Zono in January 2006 and spent $300,000 to relocate Zono's office in fall 2007. He further testified that MumboJumbo acquired a company called Ritual on January 1, 2007, for a purchase price of $2 million, and a company called Hot Lava on July 1,

2007, for a purchase price of $1 million. Finally, he testified that, through December 2007, MumboJumbo incurred acquisition and operating costs of $6.1 million in connection with those three companies, in reliance on PopCap's statements that it was "not going to go direct."

### 2. Error preservation

MumboJumbo contends that PopCap failed to preserve error because it did not object to the omission of the element of proximate cause from Question 12. PopCap responds that Rule 279 required no objection at the time of the charge conference, and that it preserved error by challenging the trial judge's deemed finding in PopCap's motion to disregard certain jury findings. We agree with PopCap.

As will be discussed below, proximate cause was an essential element of Mumbo-Jumbo's claim for sunk costs as consequential damages for fraud. That element was omitted from the jury charge without request or objection. Under Rule 279, this situation authorized the trial judge to make his own written finding on the omitted element if there was factually sufficient evidence to support such a finding. *See* TEX.R. CIV. P. 279. Because the judge made no written finding, the omitted element was deemed found by the court in such manner as to support the judgment. *See id.* If PopCap was required to take action in the trial court to preserve the argument that the deemed finding was supported by insufficient evidence, we conclude it adequately did so by asserting the argument in its postverdict "motion to disregard (and for judgment notwithstanding) certain jury findings." *See* TEX.R.APP. P. 33.1(a) (general rule for error preservation).

### 3. Application of the law to the facts

Upon proper pleading and proof, a fraud plaintiff "may recover consequential damages that are foreseeable and directly traceable to and result from the fraud." *Shell Oil Prods. Co. v. Main Street Ventures, L.L.C.,* 90 S.W.3d 375, 384 (Tex. App.-Dallas 2002, pet. dism'd); *see also Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 49 n. 1 (Tex.1998) ("When properly pleaded and proved, consequential damages that are foreseeable and directly traceable to the fraud and result from it might be recoverable."). "Thus, courts speak of a proximate cause or a foreseeability showing in the context of special or consequential actual damages" for fraud. *Lesikar v. Rappeport,* 33 S.W.3d 282, 305 (Tex.App.-Texarkana 2000, pet. denied); *see also Airborne Freight Corp., Inc. v. C.R. Lee Enters., Inc.,* 847 S.W.2d 289, 295 (Tex. App.-El Paso 1992, writ denied) (stating that fraud plaintiff may recover consequential damages "shown to be the proximate result of the misrepresentation"). Foreseeability was an element of Mumbo-Jumbo's claim for fraud to the extent MumboJumbo sought to recover consequential damages.

MumboJumbo argues that its "sunk costs" incurred in acquiring and operating other companies were direct damages rather than consequential damages. We disagree. Direct damages compensate for the loss that is the necessary and usual result of the defendant's act. *Baylor Univ. v. Sonnichsen,* 221 S.W.3d 632, 636 (Tex.2007) (per curiam). Consequential damages, by contrast, are damages that result naturally, but not necessarily, from the defendant's wrongful act. *Id.* The two measures of direct damages for fraud are the out-of-pocket measure and the benefit-of-the-bargain measure. *Formosa Plastics,* 960 S.W.2d at 49. The out-of-pocket measure is the difference between the value paid and the value received, and the benefit-of-the-bargain measure is the

difference between the value as represented and the value received. *Id.* Mumbo-Jumbo's costs in acquiring and operating Zono, Ritual, and Hot Lava do not correspond to either measure of direct damages. Whether MumboJumbo incurred these costs in reliance on representations by PopCap is not determinative because it incurred them outside of and apart from its relationship with PopCap. Mumbo-Jumbo cites nothing suggesting that the cost of acquiring software-development companies is a necessary or usual expense for a party performing a services contract like the 2006 agreement. We conclude that MumboJumbo's sunk-costs damages were consequential damages. *See Integrated Title Data Sys. v. Dulaney,* 800 S.W.2d 336, 341 (Tex.App.-El Paso 1990, no writ) (stating that expenses that arose under a contract separate from the one breached were consequential damages); *see also Cherokee Cnty. Cogeneration Partners, L.P. v. Dynegy Mktg. & Trade,* 305 S.W.3d 309, 314 (Tex.App.-Houston [14th Dist.] 2009, no pet.) (concluding that lost profits on a breached contract itself are direct damages, but profits lost on other contracts or relationships resulting from the breach are consequential damages).

■ Because MumboJumbo's sunk-cost damages were consequential damages, MumboJumbo was required to prove that those damages were foreseeable to Pop-Cap as the result of its alleged fraudulent misrepresentations and nondisclosures about its intentions to use or not to use MumboJumbo's services during Phase II. *See Shell Oil Prods. Co.,* 90 S.W.3d at 384. We conclude that MumboJumbo introduced no evidence that its costs in acquiring and operating three independent game-development companies were foreseeable to PopCap as the consequence of its alleged fraudulent misrepresentations

and nondisclosures. MumboJumbo furnishes us with several record citations, but the cited evidence does not show PopCap should have foreseen that MumboJumbo was acquiring and operating game-development companies in reliance on PopCap's representations and nondisclosures. MumboJumbo shows only the following:

- PopCap CEO David Roberts testified at trial that there was "a lot of" acquisition activity in the casual gaming industry in 2007.
- Roberts also testified that Mumbo-Jumbo had acquired Ritual, a gaming company.
- As of August 2006, Roberts had information that MumboJumbo was trying to expand its business and grow in size. He thought MumboJumbo's intent was to build "a better strategic company."
- PopCap executive vice president Denis Ryan testified that if Walmart reduced MumboJumbo's allotted slots for products, he would assume the reduction would result in loss of revenue to MumboJumbo.

This evidence would not permit a reasonable juror to find that PopCap should have foreseen that MumboJumbo would buy and operate three other software-development companies in reliance on PopCap's alleged fraudulent misrepresentations and nondisclosures. We have found no other evidence in the record to support such foreseeability. Thus, we conclude that MumboJumbo adduced no evidence in support of an essential element of its claim for "sunk costs" as consequential fraud damages.

## D. Conclusion

Based on PopCap's first two issues, we conclude that the judgment in favor of MumboJumbo is not supported by legally sufficient evidence and that PopCap con-

clusively proved its entitlement to a judgment in the amount of $1,557,618.15, plus attorneys' fees and interest. We need not consider PopCap's other issues. We next consider whether the issues raised by MumboJumbo in its cross-appeal affect our judgment.

### III. MUMBOJUMBO'S CROSS-APPEAL

MumboJumbo, MumboJumbo Distribution, LLC f/k/a Texas United Distribution, LLC, DiNucci, and Cottam all joined in a single notice of cross-appeal. An appellee/cross-appellant's brief was filed in this Court on behalf of MumboJumbo and arguably also on behalf of MumboJumbo Distribution, LLC f/k/a Texas United Distribution, LLC. DiNucci and Cottam did not file a brief or join in the appellee/cross-appellant's brief. Accordingly, we affirm the judgment as to Jay DiNucci and Mark Cottam. *See* TEX.R.APP. P. 38.8(a)(3); *In re L.N.E.*, No. 05–07–01712–CV, 2009 WL 280472, at *3 (Tex.App.-Dallas Feb. 6, 2009, no pet.) (mem. op.) (affirming judgment as to appellant who did not file brief). For the remainder of this opinion, "MumboJumbo" refers to both MumboJumbo, LLC and MumboJumbo Distribution, LLC f/k/a Texas United Distribution, LLC.

MumboJumbo asserts three issues in its cross-appeal. First, MumboJumbo contends the trial court abused its discretion by refusing to allow MumboJumbo to supplement its expert disclosures. Second, MumboJumbo contends the trial court erred by refusing to grant a new trial after PopCap made an allegedly improper and incurable jury argument. And third, MumboJumbo contends that the jury's finding of zero damages for tortious interference was against the great weight and preponderance of the evidence.

### A. Appellate jurisdiction

PopCap contends that Mumbo-Jumbo did not timely perfect its cross-appeal and thus that we lack jurisdiction to consider MumboJumbo's issues as cross-appellant. Appellate jurisdiction is never presumed. *Brashear v. Victoria Gardens of McKinney, L.L.C.*, 302 S.W.3d 542, 546 (Tex.App.-Dallas 2009, no pet.). Unless the record demonstrates the propriety of our jurisdiction, we must dismiss Mumbo-Jumbo's cross-appeal. *See id.; see also Charette v. Fitzgerald*, 213 S.W.3d 505, 509 (Tex.App.-Houston [14th Dist.] 2006, no pet.) (dismissing untimely cross-appeal).

The pertinent dates are as follows. The trial judge signed the final judgment on March 1, 2010. PopCap filed its notice of appeal on March 12, 2010. On March 29, 2010, MumboJumbo filed an instrument entitled "Motion for New Trial on Damages." On April 20, 2010, the trial judge signed an order denying MumboJumbo's motion for new trial on damages. On May 20, 2010, the eightieth day after the judgment was signed, MumboJumbo filed its notice of cross-appeal.

A notice of appeal ordinarily must be filed within thirty days after the judgment is signed. TEX.R.APP. P. 26.1. The time is extended to ninety days after the judgment signed if any party timely files a motion for new trial. TEX.R.APP. P. 26.1(a)(1). Thus, MumboJumbo's notice of cross-appeal was untimely unless its motion for new trial on damages qualified as a "motion for new trial" under Rule 26.1(a)(1). PopCap argues that Mumbo-Jumbo's motion was not a motion for new trial within the meaning of Rule 26.1(a)(1) because MumboJumbo did not seek to set aside the final judgment but rather sought a new trial "exclusively on the issue of damages." PopCap also contends that the relief requested by MumboJumbo could not have lawfully been granted because PopCap contested liability and Mumbo-Jumbo's damages were unliquidated. *See*

Tex.R. Civ. P. 320 (providing that a trial judge may order a new trial as to only part of a case under some circumstances, but "a separate trial on unliquidated damages alone shall not be ordered if liability issues are contested").

PopCap relies heavily on *Mercer v. Band*, in which the Fourteenth Court of Civil Appeals stated, "For a new trial motion to have efficacy as such, it must, by the very nature of such an instrument, seek to have an existing judgment set aside and request a relitigation of the issues." 454 S.W.2d 833, 836 (Tex.Civ.App.-Houston [14th Dist.] 1970, no writ). PopCap also refers us to the supreme court's recent statement that the fundamental nature of a motion for new trial is "not to reform, but to *vacate* the court's judgment." *In re Brookshire Grocery Co.*, 250 S.W.3d 66, 73 (Tex.2008) (orig. proceeding). Because MumboJumbo did not ask the trial judge to vacate the judgment but sought only a new trial exclusively on damages, PopCap concludes, MumboJumbo's motion did not meet the minimum requirements to qualify as a "motion for new trial" within the meaning of Rule 26.1(a)(1).

We conclude MumboJumbo's motion for new trial on damages sufficed as a motion for new trial under Rule 26.1(a)(1) and thus that MumboJumbo's notice of cross-appeal was timely. Under *Mercer*, a motion must request (1) the setting aside of an existing judgment and (2) a relitigation of the issues in order to qualify as a motion for new trial. 454 S.W.2d at 836. But in *Mercer*, the motion in question failed as to the second element—the movant requested only rendition of a new judgment in the movant's favor and not a new trial, so the court concluded that the motion was not a motion for new trial. *Id.* In the instant case, by contrast, MumboJumbo expressly

sought to relitigate some of the issues in the case. This satisfied the second element of the *Mercer* test, because Texas Rule of Civil Procedure 320 expressly authorizes the trial judge to grant a new trial as to fewer than all of the issues in the case under some circumstances. As for the element that the movant must request to set aside the existing judgment, it is true that MumboJumbo did not say specifically in its motion that it was requesting the judge to set aside the final judgment. But the relief MumboJumbo requested—a new trial on damages—necessarily implied a request that the existing judgment be vacated at least in part and a new final judgment eventually signed. Otherwise, the relief MumboJumbo expressly requested would have been meaningless. We conclude MumboJumbo's failure to request explicitly the vacatur of the existing judgment did not deprive its motion of effect as a motion for new trial. *See Taylor v. Trans–Cont'l Props., Ltd.*, 739 S.W.2d 873, 876 (Tex.App.-Tyler 1987, no writ) (construing motion as motion for new trial based on its substance, even though it did not expressly request the trial court to set aside its judgment or grant a new trial); *English v. Fischer*, 632 S.W.2d 163, 164 (Tex.App.-Corpus Christi 1982, order) (treating motion as motion for new trial despite "the formal omission of an explicit prayer for a new trial").

Moreover, a holding that a motion for new trial does not satisfy Texas Rule of Appellate Procedure 26.1(a)(1) absent an express request to vacate the judgment would set an unnecessary trap for litigants. "[A]ppellate courts should not dismiss an appeal for a procedural defect whenever any arguable interpretation of the Rules of Appellate Procedure would preserve the appeal." *Verburgt v. Dorner*, 959 S.W.2d 615, 616 (Tex.1997). Finally, we note that if the trial judge had granted

MumboJumbo's motion, a new trial would have resulted. This further weighs in favor of treating MumboJumbo's motion as a motion for new trial within the meaning of Rule 26.1(a)(1). *See Finley v. J.C. Pace, Ltd.*, 4 S.W.3d 319, 320 (Tex.App.-Houston [1st Dist.] 1999, order) (per curiam) ("If the trial court [had] granted the motion [for rehearing], a trial would have resulted. Thus, the motion may be considered a request for a new trial.") (footnote omitted), *disp. on merits*, No. 01–99–00662–CV, 1999 WL 997788 (Tex.App.-Houston [1st Dist.] Nov. 4, 1999, no pet.) (not designated for publication).

██ We also conclude that Mumbo-Jumbo's motion satisfied Rule 26.1(a)(1) even if PopCap is correct that MumboJumbo requested relief that the trial judge could not have properly granted under Texas Rule of Civil Procedure 320. As the Tyler Court of Appeals held in *Taylor*, a motion for new trial is effective to extend appellate deadlines even if the grounds asserted therein are meritless. 739 S.W.2d at 876–77. Moreover, *Verburgt* dictates that we must construe the rules of appellate procedure to preserve appeals when possible. Nothing in Rule 26.1(a)(1) compels the conclusion that only meritorious or potentially meritorious motions for new trial trigger the extension of the appeal deadline. On the face of the rule, any timely filed motion for new trial suffices to trigger the deadline. We will not complicate the rule's application by adding a requirement that the motion also be meritorious or even potentially meritorious.

MumboJumbo's notice of cross-appeal was timely, so we have jurisdiction over its cross-appeal.

## B. Supplementation of expert disclosures

In MumboJumbo's first issue, it contends that the trial judge abused his discretion by denying MumboJumbo leave to designate a new expert witness on damages. MumboJumbo sought this leave after the deadline for expert designations had expired and after the trial judge struck MumboJumbo's original damages expert as unreliable.

### 1. Facts

Under the relevant scheduling order, MumboJumbo's deadline to designate its damages expert was September 5, 2008, and the trial date was August 18, 2009. After MumboJumbo designated James Herblin as its damages expert, PopCap filed a motion and a supplemental motion to exclude Herblin's opinions from evidence as unreliable. The trial judge heard PopCap's motions in July 2009 and granted the motions, excluding all damages testimony by Herblin. Shortly thereafter the judge postponed the trial date to September 29, 2009. In August 2009, Mumbo-Jumbo's counsel moved to withdraw, and new counsel appeared for MumboJumbo and moved for a continuance. The judge then postponed the trial date to January 5, 2010.

In September 2009, about three and a half months before the trial date, Mumbo-Jumbo filed the motion at issue, its motion for leave to supplement expert disclosures. MumboJumbo asked the court to allow MumboJumbo to designate a new expert to testify about its damages, arguing that it could demonstrate both good cause and the absence of unfair surprise or prejudice to PopCap under Texas Rule of Civil Procedure 193.6. MumboJumbo attached the curricula vitae of its two proposed experts (one testifying expert and one consulting expert) to its motion. PopCap opposed the motion, and the trial judge denied it after a hearing.

### 2. Applicable law

The parties argue this issue in terms of Rule 193.6, which prescribes the effect of failure to timely respond to discovery. The general rule is that a party who does not timely identify a witness may not call that witness at trial. Tex.R. Civ. P. 193.6(a). To avoid the exclusionary rule, the proponent of the witness must establish either that there was good cause for the failure to identify the witness in a timely manner, or that the failure to make timely disclosure will not unfairly surprise or unfairly prejudice the other parties. Tex.R. Civ. P. 193.6(a), (b); *Fort Brown Villas III Condo. Ass'n, Inc. v. Gillenwater*, 285 S.W.3d 879, 881 (Tex.2009) (per curiam). Our standard of review of the trial judge's decision is abuse of discretion. *Fort Brown Villas*, 285 S.W.3d at 881. "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex.2003).

■ The good-cause exception allows a trial judge to excuse a party's failure to comply with discovery obligations in difficult or impossible circumstances. *Harris Cnty. v. Inter Nos, Ltd.*, 199 S.W.3d 363, 367 (Tex.App.-Houston [1st Dist.] 2006, no pet.); *see also Alvarado v. Farah Mfg. Co., Inc.*, 830 S.W.2d 911, 914 (Tex.1992) (construing predecessor to Rule 193.6). The following factors, standing alone, do not constitute good cause: the inadvertence of counsel, lack of surprise, and the uniqueness of the excluded evidence. *Alvarado*, 830 S.W.2d at 915; *Harris Cnty.*, 199 S.W.3d at 367.

■ The other exception allows a trial judge to excuse a party's failure to comply with its discovery obligations if the admission of the undisclosed or untimely disclosed evidence will not unfairly surprise or unfairly prejudice the other parties. *See* Tex.R. Civ. P. 193.6(a)(2). In this inquiry, we focus on whether the evidence will cause unfair surprise or prejudice, and not on whether the "issue" to which the evidence is directed will unfairly surprise or prejudice the other parties. *See Lopez v. La Madeleine of Tex., Inc.*, 200 S.W.3d 854, 862 (Tex.App.-Dallas 2006, no pet.). The fact that a party needs an expert to establish its cause of action does not establish that other parties will not be unfairly surprised by the late designation of an expert. *Ersek v. Davis & Davis, P.C.*, 69 S.W.3d 268, 272 (Tex.App.-Austin 2002, pet. denied). Offering other parties an opportunity to depose a late-designated expert also does not ensure the absence of unfair surprise or prejudice. *Id.*

### 3. Application of the law to the facts

■ We conclude that the trial judge did not abuse his discretion by denying MumboJumbo's motion for leave to supplement its expert disclosures.

MumboJumbo contends that the incompetence of its prior counsel and its prior expert witness constitute good cause to allow it to designate new experts after the discovery deadline expired. We disagree. We have found no case holding that the exclusion of an expert witness's opinion as unreliable under Texas Rule of Evidence 702 can constitute good cause for late disclosure of new experts. As previously noted, inadvertence of counsel is not good cause for late designation of new experts. *See Alvarado*, 830 S.W.2d at 915. We think that this rule is broad enough to encompass MumboJumbo's contention that it needed new experts because of the incompetence of its original trial counsel and original expert. The trial judge reasonably concluded that the inadmissibility of the testimony of an expert witness on reliability grounds is not a difficult or impossible circumstance rising to the level of good cause.

The trial judge concluded that Mumbo-Jumbo had not carried its burden of demonstrating that its late designation would not cause unfair surprise or unfair prejudice to PopCap. With respect to surprise, MumboJumbo argues that PopCap would not have been unfairly surprised because MumboJumbo's new expert was going to use the same information and categories of damages to reach her opinions. But MumboJumbo acknowledges that its new expert would have had to use a different methodology to avoid the problems encountered by MumboJumbo's original expert. The trial judge could have concluded—without abusing his discretion—that it would be unfair to require PopCap to prepare to meet a new methodology only three months before trial.

As for unfair prejudice, one of PopCap's attorneys testified that PopCap retained two experts to evaluate the damages analysis performed by MumboJumbo's original expert witness. Over the ten months that elapsed from the time MumboJumbo designated the expert to the time the trial judge ruled that his opinions were inadmissible, PopCap incurred about $425,000 in attorneys' fees and expert fees to analyze and oppose that expert's opinion. PopCap's attorney also testified that the three months between the hearing of MumboJumbo's motion for leave and the trial date would not be enough time for PopCap to analyze and oppose MumboJumbo's new experts' opinions, so the granting of leave would also necessitate a delay of the trial. He testified that even a continuance of the trial would be prejudicial to PopCap because the case was very burdensome to the company and a distraction to its executives. Even assuming MumboJumbo put on some controverting evidence, a trial judge does not abuse his discretion if he bases his decision on conflicting evidence and some evidence supports his decision. *In re P.C.S.*, 320

S.W.3d 525, 531 (Tex.App.-Dallas 2010, pet. denied). We conclude the trial judge did not abuse his discretion in concluding that MumboJumbo had failed to carry its burden of establishing the absence of unfair surprise or unfair prejudice.

Moreover, MumboJumbo did not make an offer of proof to demonstrate what its late-designated testifying expert would have testified to at trial. It contends that the denial of its motion for leave was automatically harmful because that ruling left MumboJumbo without expert testimony to support its damages model. But any error was harmless unless MumboJumbo's new testifying expert could have provided reliable, admissible testimony in support of its damages. Without an offer of proof, we would be speculating if we were to assume that MumboJumbo's new testifying expert would have furnished such evidence. *See* Tex.R. Evid. 103(a)(2) (error cannot be predicated on the exclusion of evidence unless the substance of the evidence was made known by offer of proof or was apparent from the context); *Bobbora v. Unitrin Ins. Servs.*, 255 S.W.3d 331, 335 (Tex. App.-Dallas 2008, no pet.) ("[W]ithout an offer of proof, we can never determine whether exclusion of the evidence was harmful.").

For these reasons, we reject Mumbo-Jumbo's first issue in its cross-appeal.

## C. Improper jury argument

In its second issue, MumboJumbo argues that PopCap's counsel made an improper closing argument to the jury. MumboJumbo seems to contend that the trial judge erred in two respects in dealing with the allegedly improper argument: (1) by failing to give a curative instruction to the jury, and (2) by failing to grant MumboJumbo a new trial because the argument was incurable.

### 1. Facts

One of MumboJumbo's theories in this case was that PopCap's conduct caused MumboJumbo to lose an opportunity to be acquired by a company called RealNetworks. Cottam testified that under one version of the potential acquisition, RealNetworks would have paid $20 million at closing, with some of that amount going into an escrow account. PopCap later called an expert witness, John Taylor, who testified that in his opinion the acquisition deal would not have closed. Taylor also testified that he had spoken with Steve Mauri, who was the representative of RealNetworks primarily responsible for generating the "term sheet" that outlined the potential acquisition transaction. Specifically, Taylor testified as follows:

> Q. And based on your analysis of this particular transaction, in your opinion would this deal have closed?
>
> A. No, it would not have.
>
> . . .
>
> Q. Who did you speak with at RealNetworks regarding the very transaction that Mr. Cottam says was a done deal?
>
> A. I spoke with Steve Mauri.
>
> Q. And did your discussions with Mr. Mauri form, in large part, your opinions regarding whether or not any deal with MumboJumbo ever would have closed?
>
> A. Yes, absolutely.

Later, after this testimony had been admitted, the judge ruled that he would not allow Taylor to testify as to what Mauri said, but he could testify about how it affected his opinion. Still later, the judge stated:

> I don't see an adequate explanation as to the delay in contacting RealNetworks, and so I'm going to order that the witness not be allowed to testify—obviously he can testify about the term sheets, these were exchanged back when, but as far as how any conversations with Real-Networks affected his opinions.

However, the judge did not strike Taylor's prior testimony quoted above.

MumboJumbo's argument on appeal concerns PopCap's closing argument based on Taylor's testimony. We quote the relevant part of PopCap's closing argument, as well as the objection and subsequent discussion:

> We heard from Mr. Taylor. He corroborated every single fact about this transaction with Mr. Mauri. This was a dead deal as soon as this happened. That deal was never going to get done. That deal was never going to get done. That $20 million that Mr. Cottam is now—
>
> MumboJumbo: Pardon me, counsel. Your Honor, I would object. Counsel tried to elicit testimony about what Mr. Mauri said yesterday. The Court sustained it and struck the effort. And now he just volunteered evidence that didn't get into evidence because the Court properly struck it.
>
> PopCap: I did not.
>
> MumboJumbo: He said Mr. Mauri validated everything that Mr. Taylor said, and that was never in evidence.
>
> PopCap: I did not say anything about what he said.
>
> The Court: Well, ladies and gentlemen, what was in evidence and what was not in evidence, you heard it, you're the ultimate deciders as to what was said and what was not.

After the statement by the judge, PopCap proceeded with its closing argument. On appeal, MumboJumbo argues that Pop-Cap's argument was improper because it referred to evidence not in the record and because it implied that Cottam had testified falsely when he testified that RealNetworks intended to buy MumboJumbo.

## 2. Analysis

To prevail on this issue, MumboJumbo must show (1) that PopCap made an improper jury argument (2) that was not invited or provoked, (3) that was preserved by proper objection or other predicate, and (4) that was not curable by an instruction, prompt withdrawal of the statement, or a reprimand by the judge. *See Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex.1979). Arguing matters outside the evidence can be improper jury argument. *See* Tex.R. Civ. P. 269(e) ("Counsel shall be required to confine the argument strictly to the evidence and to the arguments of opposing counsel."); *see also Lone Star Ford, Inc. v. Carter*, 848 S.W.2d 850, 853 (Tex.App.-Houston [14th Dist.] 1993, no writ) (holding that argument was improper because it was not confined to the evidence and the argument of opposing counsel). Reasonable inferences and deductions from the evidence, by contrast, are permissible in closing argument. *Kia Motors Corp. v. Ruiz*, No. 05–10–00198–CV, 2011 WL 3435787, at *12 n. 8 (Tex.App.-Dallas Aug. 5, 2011, no pet. h.). Hyperbole is also generally a permissible rhetorical technique in closing argument. *See Standard Fire Ins. Co.*, 584 S.W.2d at 838 ("Hyperbole has long been one of the figurative techniques of oral advocacy.").

In rare cases, an improper argument is considered incurable, and objection is not required. *Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008). Examples of incurable improper jury arguments can include appeals to racial prejudice, unsupported accusations of witness tampering by the opposing party, and unsupported, extreme, and personal attacks on opposing parties and witnesses. *Id.* at 681; *see also Cottman Transmission Sys., L.L.C. v. FVLR Enters., L.L.C.*, 295 S.W.3d 372, 380 (Tex.App.-Dallas 2009,

pet. denied) (recognizing that incurable argument can include unsupported charges of perjury and the use of inflammatory epithets such as "liar" and "cheat").

PopCap contends that MumboJumbo failed to preserve error by obtaining a ruling on its objection from the trial judge. MumboJumbo contends that the trial judge implicitly overruled its objection and that the jury argument was incurable in any event. We agree with PopCap. Although MumboJumbo objected, the trial judge did not rule on its objection, either expressly or implicitly, and MumboJumbo did not object to the judge's failure to rule. *See* Tex.R. App. P. 33.1(a)(2). Because error was not preserved, MumboJumbo must show that the jury argument was incurable. The argument did not involve appeals to racial prejudice, extreme or personal attacks on the opposing party, unsupported charges of perjury, or inflammatory epithets. The alleged impropriety, that PopCap's counsel argued evidence that was not in the record, does not rise to the level of incurable argument.

Alternatively, we conclude that the jury argument in question was not improper. Taylor's testimony—the admission of which MumboJumbo does not assign as error on appeal—boils down to assertions that (1) he spoke with RealNetworks representative Mauri about the transaction in question, (2) his conversation with Mauri largely formed his opinions about whether the transaction would have occurred, and (3) in his opinion the transaction would not have occurred. PopCap's closing argument that Taylor "corroborated every single fact about this transaction with Mr. Mauri," though perhaps hyperbolic, was a reasonable inference from Taylor's testimony. *See Standard Fire Ins. Co.*, 584 S.W.2d at 838 (holding it was not improper for defendant

to argue that personal-injury plaintiff "drove by a thousand doctors between the Astrodome and Spring Branch" in order to see the doctor his lawyer sent him to). Nor was PopCap's argument that the jury should believe Taylor an improper personal attack on Cottam. PopCap did not accuse him of being a liar or perjurer. Simply arguing that the jury should accept Taylor's opinion about whether the acquisition would have occurred instead of Cottam's was not improper argument. *See State v. Williams*, 932 S.W.2d 546, 557 (Tex.App.-Tyler 1995) ("Whether by cross-examination or advocacy, counsel can comment on the credibility of witnesses."), *writ denied and disapproved in part on other grounds*, 940 S.W.2d 583 (Tex.1996) (per curiam).

We reject MumboJumbo's second issue in its cross-appeal.

**C. Sufficiency of the evidence**

In its third and final issue, MumboJumbo asserts that the jury's finding that PopCap's tortious interference with MumboJumbo's contract with Walmart proximately caused MumboJumbo zero damages was against the great weight and preponderance of the evidence. When a party attacks the factual sufficiency of the evidence to support a finding on an issue as to which it had the burden of proof, it must show that the adverse finding is against the great weight and preponderance of the evidence. We must consider and weigh all of the evidence, and we set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that the verdict is clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex.2001) (per curiam); *Buckeye Retirement Co., LLC, Ltd. v. Bank of Am., N.A.*, 239 S.W.3d 394, 399 (Tex.App.-Dallas 2007, no pet.). If we

agree with the appellant that the finding is against the great weight and preponderance of the evidence, we must detail the relevant evidence and state how the contrary evidence greatly outweighs the evidence in support of the verdict. *Dow Chem. Co.*, 46 S.W.3d at 242.

■■■■ We reject MumboJumbo's third issue as conclusory and inadequately briefed. The trial record in this case consists of 10 volumes of testimony and over 250 exhibits. MumboJumbo's argument in support of its factual-sufficiency challenge takes up slightly less than one page of its brief. Instead of analyzing all of the evidence in the record, as required by the standard of review, MumboJumbo simply asserts that it "introduced evidence of loss in business value, lost profits, and sunk costs, all incurred as a result of PopCap's interference with the MumboJumbo–Wal–Mart business relationship," followed by a string citation to a smattering of pages from the reporter's record and a single exhibit. After that, it concludes its argument, "Finding that the interference occurred but that no damages were sustained is contrary to the evidence, clearly wrong and unjust to MumboJumbo. Thus, if the judgment is reversed [on PopCap's appeal], the case should be remanded for a new trial." MumboJumbo does not explain what the cited pages of the record prove, or why the evidence in support of its tortious-interference damages so outweighs the contrary evidence that the jury's decision was clearly wrong and unjust. "Failure to provide substantive analysis waives an issue on appeal." *In re M.A.S.*, 233 S.W.3d 915, 924 (Tex.App.-Dallas 2007, pet. denied); *see also In re B.A.B.*, 124 S.W.3d 417, 420 (Tex.App.-Dallas 2004, no pet.) ("The failure to adequately brief an issue, either by failing to specifically argue and analyze one's position or provide authorities and record cita-

tions, waives any error on appeal."). MumboJumbo's bald assertion that the jury's zero damages findings was against the great weight and preponderance of the evidence, even coupled with a string citation to the record, does not amount to a substantive analysis of its issue.

We decline to consider MumboJumbo's third issue in its cross-appeal because it was inadequately briefed.

## IV. DISPOSITION

We reverse the judgment to the extent it awards MumboJumbo any recovery against PopCap, and we render judgment that MumboJumbo take nothing. We also reverse the judgment to the extent it orders PopCap to take nothing from Mumbo-Jumbo, and we render judgment that Pop-Cap recover damages from MumboJumbo in the amount of $1,557,618.15. We remand the case for determination of Pop-Cap's recoverable attorneys' fees and for appropriate awards of prejudgment interest, postjudgment interest, and costs of court. In all other respects, we affirm the judgment of the trial court.