# IN THE SUPREME COURT OF TEXAS

═══════════

No. 19-1054

═══════════

SUNDOWN ENERGY LP; SMC 2000 LP, PGP HOLDINGS 1, LLC; SMITH ALLEN OIL
& GAS, LLP; TRANSMOUNTAIN EXPLORATION LLC; FORTUNE NATURAL
RESOURCES CORPORATION; TEXAS HEAT OF THE PERMIAN BASIN, INC.; WHITING
OIL AND GAS CORPORATION; EAGLE ROCK ACQUISITION PARTNERSHIP II, LP;
ODYSSEY ROYALTIES LLC; HORIZON ROYALTIES LLC; PINECONE RESOURCES LLC;
BRENDA DORMAN FAUGHT; AND LENA RENEE BRIGMAN,
PETITIONERS,

v.

HJSA NO. 3, LIMITED PARTNERSHIP, RESPONDENT

═══════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE EIGHTH DISTRICT OF TEXAS

═══════════════════════════════

**PER CURIAM**

This contract dispute involves the interpretation of a mineral lease's "continuous drilling

program" provision. The lessor contends the provision operates as a special limitation that

terminated the lease as to non-producing tracts when the lessee failed to timely "spud-in" new

wells.[1] We hold that under the lease's special definition of "drilling operations," activities other

---

[1] "Spudding-in" is a term of art in the oil-and-gas industry that means "[t]he first boring of the hole in the drilling of an oil well." P. MARTIN AND B. KRAMER, WILLIAMS & MEYERS—MANUAL OF OIL AND GAS TERMS 1007 (16th ed. 2015).

than spudding-in a well are sufficient to maintain the lease as to non-producing tracts. Because the lessee timely conducted "drilling operations," as that term is defined in the lease, the court of appeals erred in reversing partial summary judgment for the lessee on the contract-construction issue. We therefore reverse the court of appeals' judgment in part, render judgment in the lessee's favor, and remand to the trial court for further proceedings.

Lessor HJSA No. 3 LP (HJSA) and lessee Sundown[2] are successors-in-interest to an oil-and-gas top lease covering a 30,450-acre parcel of land in Ward County, Texas. The lease delineates rights, royalties, and responsibilities with respect to three areas comprising the parcel: (1) the Chevron Producing Area, (2) the 3-B Producing Area, and (3) the remainder. The Chevron Producing Area and the 3-B Producing Area, collectively defined as the "Producing Areas," encompass approximately 19,570 acres as to depths from the surface to the base of the Pennsylvanian formation. The remainder—only some of which is at issue in this lawsuit—covers all depths for 10,880 acres plus depths below the Pennsylvanian formation in the 19,570 acres under the Producing Areas.

During the lease's six-year primary term, which became effective on August 4, 2000, production in paying quantities from anywhere on the leased premises was sufficient to maintain the lease as to the entire parcel. At the end of the primary term, however, Sundown was required to "reassign to Lessor . . . all of Lessee's operating rights in [each individual tract] of the lease not

---

[2] The lessees collectively referred to as "Sundown" are Sundown Energy LP; SMC 2000 LP; PGP Holdings 1, LLC; Smith Allen Oil & Gas, LLP; Transmountain Exploration LLC; Fortune Natural Resources Corp.; Texas Heat of the Permian Basin, Inc.; Whiting Oil & Gas Corp.; Eagle Rock Acquisition Partnership II, LP; Odyssey Royalties LLC; Horizon Royalties LLC; Pinecone Resources LLC; Brenda Dorman Fought; and Lena Renee Brigman.

2

then held by production" unless Sundown was engaged in a "continuous drilling program." Paragraph 7(b) sets out the requirements for a "continuous drilling program" as follows:

**7. REASSIGNMENT OBLIGATIONS: CONTINUOUS DRILLING**

. . . .

(b) The obligation . . . to reassign tracts not held by production shall be delayed for so long as Lessee is engaged in a continuous drilling program on that part of the Leased Premises outside of the Producing Areas. The first such continuous development well shall be *spudded-in* on or before the sixth anniversary of the Effective Date, with no more than 120 days to elapse between completion or abandonment of operations on one well and commencement of *drilling operations* on the next ensuing well.[3]

Before the sixth anniversary of the top lease's effective date, Sundown spudded-in three development wells, thus satisfying Paragraph 7(b)'s requirement of a timely spudded "first such continuous development well." Thereafter, Sundown timely engaged in other "drilling operations," spending upwards of $40 million developing the lease, including drilling a total of fourteen development wells from 2006 to 2015. Paragraph 18 of the lease defines "drilling operations" as three categories of operations that include, but are not limited to, spudding-in a well:

**18. DRILLING OPERATIONS DEFINED**

*Whenever used in this lease* the term "drilling operations" shall mean: [1] actual operations for drilling, testing, completing and equipping a well (spud in with equipment capable of drilling to Lessee's object depth); [2] reworking operations, including fracturing and acidizing; and [3] reconditioning, deepening, plugging back, cleaning out, repairing or testing of a well.[4]

---

[3] Emphases added.

[4] Emphasis added.

Notwithstanding Sundown's continued "drilling operations," HJSA filed suit in 2016 seeking a declaration that the lease had terminated in 2007 as to non-producing tracts because Sundown failed to engage in a "continuous drilling program."[5] HJSA argued that to maintain the lease on tracts not held by production, Sundown had to spud-in a new well every 120 days after the completion or abandonment of operations on a prior well but, for six specified periods, had failed to do so within the time frame Paragraph 7(b) provides. Sundown's counterclaim asserted that the lease's plain language expressly allowed Sundown to maintain the lease as to tracts not held by production by engaging in "drilling operations," including drilling, reworking, fracturing, and other well operations that are not limited to spudding-in a new well.

On cross-motions for partial summary judgment, the parties disputed whether the definition of "drilling operations" in Paragraph 18 applies to that phrase when used in Paragraph 7(b) or whether Paragraph 7(b)'s context provides a different definition for "drilling operations" that means only spudding-in a new well. The parties agreed then, as they do now, that if Paragraph 18 supplies the controlling definition, Sundown engaged in a continuous drilling program that effectively delayed reassignment of tracts not held by production.

The trial court concluded that the special definition in Paragraph 18 applies and, on that basis, granted partial summary judgment for Sundown that the lease had not terminated as to the non-producing tracts. But on permissive interlocutory appeal,[6] a divided court of appeals reached the opposite conclusion on the contract-construction issue. The court reversed summary judgment

---

[5] HJSA's action to quiet title and suit for an accounting were similarly premised on the lease having terminated as to the contested tracts.

[6] TEX. CIV. PRAC. & REM. CODE § 51.014(d), (f).

4

in part, holding that (1) a continuous drilling program under Paragraph 7(b) requires spudding-in a continuous development well within 120 days of completion or abandonment of operations on a prior well and (2) Paragraph 7(b) assigns a more specific definition of "drilling operations" that controls over the general definition in Paragraph 18.[7] The court further held that Paragraph 7(b) imposes a special limitation that caused the lease to terminate according to its own terms when Sundown failed to timely spud-in wells.[8]

The dissent found the majority's construction of the lease repugnant to its plain language, observing that "[w]here parties to a contract expressly define a contractual term, the parties' agreed definition must prevail over other definitions."[9] Because the parties agreed that the definition in Paragraph 18 would apply "whenever" the phrase "drilling operations" is used in the lease, it applied "every time," including in Paragraph 7(b).[10] For that reason, the dissent concluded Sundown was entitled to partial summary judgment.

"The general principles that govern our construction of contracts also govern our construction of mineral leases."[11] Summary judgment and the construction of a contract present questions of law we review de novo.[12] "When construing a contract, the court's primary concern

---

[7] 587 S.W.3d 864, 876 (Tex. App.—El Paso 2019). The court also affirmed the trial court's judgment striking portions of affidavits the parties offered to inform the contract's meaning, *id.* at 877, but that holding is not challenged on appeal to this Court.

[8] *Id.* at 872-73.

[9] *Id.* at 882 (Palafox, J., dissenting).

[10] *Id.* at 880-82 (applying the dictionary definition of the term "whenever").

[11] *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 595 (Tex. 2018).

[12] *Id.*; *see URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018) ("Both the presence of ambiguity and interpretation of an unambiguous contract are questions of law we review de novo using well-settled contract-construction principles."). As the parties agree, and the lower courts found, the mineral lease is not ambiguous because it carries a definite and certain meaning. *See URI*, 543 S.W.3d at 765.

is to give effect to the written expression of the parties' intent."[13] Words must be construed "in the context in which they are used,"[14] but courts "cannot interpret a contract to ignore clearly defined terms."[15] Equally important, we avoid construing contracts in a way that renders contract language meaningless.[16]

As Sundown observes, the parties expressly agreed that Paragraph 18's definition of "drilling operations" would apply "whenever" that phrase is used in the lease. The lease provides no exceptions. As such, the lease plainly requires "drilling operations" in Paragraph 7(b) to include all of the operations Paragraph 18 delineates, not just spudding-in a well.

Notwithstanding Paragraph 18's clear directive, HJSA urges that a different meaning must be inferred from Paragraph 7(b)'s language read in isolation and, further, that the inferred meaning must take precedence as being more "specific" than Paragraph 18's definition. HJSA provides no textual basis for ignoring the definition the parties prescribed.

In addition to explicitly requiring the phrase "drilling operations" to carry the same meaning throughout the lease, Paragraph 7(b)'s description of a "continuous drilling program" distinguishes between "spudd[ing]-in" the first continuous development well and timely commencement of "drilling operations" thereafter. Juxtaposition of "spudded-in" and "drilling operations"—a defined phrase that includes but is not limited to well-spudding activities—

---

[13] *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994).

[14] *URI*, 543 S.W.3d at 764.

[15] *FPL Energy, LLC v. TXU Portfolio Mgmt. Co.*, 426 S.W.3d 59, 64 (Tex. 2014); *see* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 228 (2012) ("It is very rare that a defined meaning can be replaced with another permissible meaning of the word on the basis of other textual indications; the definition is virtually conclusive.").

[16] *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 747 (Tex. 2020).

underscores the parties' expressed intent to apply the broader definition of "drilling operations" to the entire lease, including Paragraph 7(b). As a general proposition, using different language in different parts of a contract means the parties intended different things.[17] More to the point, we cannot simply substitute "spudded-in" for "drilling operations" when the parties chose not to do so. Nor can we apply an interpretation of Paragraph 7(b) that would render these distinctions meaningless.[18] Had the parties intended to limit drilling operations to well-spudding activities, they could easily have done so as they did in regard to the first continuous development well.

In addition to citing textual clues in Paragraph 7(b) as constricting Paragraph 18's mandate, HJSA presses the Court to construe the lease "from a utilitarian standpoint" bearing in mind that the mineral lease's objective is to encourage the full exploration and development of substantial undeveloped acreage.[19] HJSA argues the contract cannot reasonably be construed as allowing Sundown to maintain the lease as to non-producing tracts by spudding-in a single development well. Sundown counters that Paragraph 7(b) is designed to maximize production in non-producing areas, not just drill new wells. To that end, Sundown points out that fracturing, reworking, and other activities defined as "drilling operations" are production-maximizing activities that can be more cost-effective than drilling new wells.

---

[17] *PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 708 (Tex. App.—Dallas 2011, pet. denied); *see, e.g.*, *FPL Energy*, 426 S.W.3d at 67-68 (giving meaning to different contract terms by declining to construe one as referring to the other when the contract treated them distinctly throughout).

[18] *See Piranha Partners*, 596 S.W.3d at 747 (courts must apply "well-settled contract-construction principles" to determine whether a contract is ambiguous and to interpret the contract if it is not, including applying definitions provided in the instrument, construing words in context, and avoiding constructions that render provisions meaningless).

[19] *See Frost Nat'l Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005).

The principle of freedom of contract requires us to recognize that "sophisticated parties have broad latitude in defining the terms of their business relationship,"[20] and courts are obliged to enforce the parties' bargain according to its terms.[21] As we have said time and again, courts may not rewrite a contract under the guise of interpretation.[22] Furthermore, HJSA's concern that Sundown could theoretically stymie production is not as compelling as the lease's express language because, as stated in Paragraph 7(d), Sundown retains an implied duty to reasonably develop the leased premises: "Nothing in this paragraph 7 or elsewhere in this lease is intended to relieve Lessee of Lessee's implied duty to reasonably develop the Leased Premises, including the Producing Areas."[23]

Finally, we address the court of appeals' argument that our decision in *Exxon Corp. v. Emerald Oil & Gas Co.*[24] forecloses Sundown's argument that the introductory phrase in Paragraph 18, "[w]henever used in this lease," manifested the parties' intent to have that definition

---

[20] *FPL Energy*, 426 S.W.3d at 67.

[21] *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996) ("We have long held that courts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained.").

[22] *See, e.g.*, *Dall. Power & Light Co. v. Cleghorn*, 623 S.W.2d 310, 312 (Tex. 1981) ("[A] court does not have the power to place a different interpretation upon the contract on grounds of policy that it would be better for the lessor or landowners generally to have the contract different." (quoting 2 W. SUMMERS, OIL AND GAS § 373 (1959))); *Provident Fire Ins. Co. v. Ashy*, 162 S.W.2d 684, 687 (Tex. 1942) ("Parties make their own contracts, and it is not within the province of this court to vary their terms in order to protect them from the consequences of their own oversights and failures in nonobservance of obligations assumed." (quoting *Dorroh-Kelly Mercantile Co. v. Orient Ins. Co.*, 135 S.W. 1165, 1167 (1911))); *E. Tex. Fire Ins. Co. v. Kempner*, 27 S.W. 122, 122 (Tex. 1894) ("[W]here the language is plain and unambiguous, courts must enforce the contract as made by the parties, and cannot make a new contract for them, nor change that which they have made under the guise of construction.").

[23] In this regard, we note that Sundown's development efforts went well beyond drilling a single well. The record establishes, and HJSA does not dispute, that Sundown drilled fourteen wells and spent $40 million on drilling operations under the lease.

[24] 348 S.W.3d 194 (Tex. 2011).

"plugged-in whenever the term ['drilling operations'] was used" in the lease.[25] In *Emerald Oil*, the definition of the term "diligently" in Article 4 of the lease was introduced with the statement that it would apply in each instance the word was used throughout the lease.[26] Nevertheless, we held that the definition did not apply to impose a greater duty than the specifically defined duty provided in the development clause in Article 3 of the lease.[27] Though the court of appeals found *Emerald Oil* dispositive, it is distinguishable in material respects.

First, the development paragraph in Article 3 expressly defined the relevant term differently from the duty prescribed by Article 4 and, in doing so, created a contradiction that prevented the lessee from complying with the two provisions at issue.[28] Here, unlike *Emerald Oil*, the lease does not provide conflicting express definitions or incompatible obligations. Rather, HJSA relies on what it views as textual indicators that provide a more limited definition for purposes of Paragraph 7(b) than the express definition in Paragraph 18. While Paragraph 7(b) might be considered as providing a definition of "continuous drilling program," it does so, in part, by incorporating the special definition from Paragraph 18 except—notably—with respect to the first development well. Second, unlike *Emerald Oil*, HJSA construes the phrase "drilling operations" to impose a greater burden in Paragraph 7(b) than the parties' agreed understanding of that phrase.[29] The construction HJSA advocates thus presents the opposite scenario from *Emerald Oil*. In short, as compared to the lease in *Emerald Oil*, the HJSA–Sundown lease does not express

---

[25] 587 S.W.3d 864, 876 (Tex. App.—El Paso 2019).

[26] *Emerald Oil*, 348 S.W.3d at 210.

[27] *Id.* at 214-15.

[28] *Id*. (reasoning that both provisions are "contradictory to the other").

[29] *See id*. at 215 (resolving not to impose "a more stringent obligation unless it is clear that the parties intended to warrant production beyond that defined obligation").

an intent to provide a different definition for "drilling operations" or to limit it to well-spudding operations. Had that been the case, the parties could have expressed that intent simply by using the same terms consistently in Paragraph 7(b) or by excluding Paragraph 7(b) from Paragraph 18's application.

Because "drilling operations" in paragraph 7(b) includes other activities in addition to spudding-in a well, and because there is no dispute Sundown timely engaged in those activities, the summary-judgment record conclusively establishes that Sundown was engaged in a "continuous drilling program" within the meaning of Paragraph 7(b).[30] Under the lease's plain and unambiguous language, the result is that Sundown's timely drilling operations delayed the reassignment of tracts not held by production.

Accordingly, without hearing oral argument,[31] we reverse the court of appeals' judgment in relevant part, render judgment that Sundown was not obligated to reassign the contested parts of the leased premises, and remand to the trial court for further proceedings.

**OPINION DELIVERED:** April 9, 2021

---

[30] *See* TEX. R. CIV. P. 166a(c).

[31] *See* TEX. R. APP. P. 59.1.