**REVERSE and REMAND in part; AFFIRMED in part; and Opinion Filed January 27, 2023**



**In The**

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-21-00104-CV**

**HISHAM BISMAR, DIMA BISMAR, AND DANNA BISMAR, Appellant**

**V.**

**RUTH J. MITCHELL, Appellee**

**On Appeal from the 193rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-19-16320**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Reichek, and Goldstein
Opinion by Justice Goldstein

This is an appeal from the grant of summary judgment in favor of appellee

Ruth J. Mitchell on her claims against appellants Hisham, Dima, and Danna Bismar[1]

for breach of a lease agreement, retaliatory lease termination, and certain statutory

violations related to the lease. In three issues, the Bismars contend that the trial court

erred in granting Mitchell's motion for summary judgment. We affirm in part,

reverse in part, and remand to the trial court for proceedings consistent with this

---

[1] We refer to appellants Hisham Bismar, Dima Bismar, and Danna Bismar individually by their first names and collectively as the Bismars.

opinion. As all questions before us are settled in law, we issue this memorandum opinion. *See* TEX. R. APP. P. 47.2(a).

## BACKGROUND

In April 2018, Mitchell and the Bismars entered into a residential lease agreement for a condominium unit located in Dallas, Texas, identified therein as the "Property." Under the lease, Hisham and Dima were the property owners, Danna was the property manager, and Mitchell, a licensed Texas attorney, was the tenant. The lease commenced on May 4, 2018, with an initial one-year term and automatic monthly renewal after the initial term unless timely terminated in writing by either party. Paragraph 18 of the lease provides, in relevant part:

18. **REPAIRS**: (Notice: Subchapter B. Chapter 92. Property Code governs repair obligations).

A. Repair Requests: All requests for repairs must be in writing and delivered to Landlord. . . . In the event of an emergency related to the condition of the Property that materially affects the physical health or safety of an ordinary tenant, Tenant may call Landlord or, if applicable, the property manager, at [*blank filled in with Danna's name and phone number*]. Ordinarily, a repair to the heating and air conditioning system is not an emergency.

. . . .

C. Completion of Repairs:

(1) Tenant may not repair or cause to be repaired any condition, regardless of the cause, without Landlord's permission. All decisions regarding repairs, including the completion of any repair, whether to repair or replace the item, and the selection of contractors, will be at Landlord's sole discretion.

. . . .

–2–

D. <u>Payment of Repair Costs</u>:

> (1) Except as otherwise specified in this lease, Landlord will pay to repair or remedy conditions in the Property in need of repair if Tenant complies with the procedures far requesting repairs as described in this Paragraph 18. This includes, but is not limited to, repairs to the following items not caused by Tenant or Tenant's negligence:
>
> (a) heating and air conditioning systems. . . .

On July 16, 2018, at 9:25 p.m., Mitchell wrote an email to the Bismars stating that the air conditioning in her unit was not working properly and "the temperature will not go below 73 [degrees]."[2] At 6:29 a.m. the next morning, Danna responded by email: "I am so sorry to hear that! I would first put in a work order to see if they can diagnose the problem and we can go from there." About an hour later, Danna wrote again: "I completely forgot that we actually purchased [a warranty with] American Homeshield for the unit." Danna directed Mitchell to login to American Homeshield's website or call its phone number and set up an appointment for the repair. Mitchell did so, and American Homeshield hired A-US Air to repair the air conditioning unit. On July 18, an A-US Air technician arrived at Mitchell's condominium, inspected the air conditioning unit, and added coolant to it. That did not resolve the problem, and Mitchell emailed Danna on July 19 stating that the coolant had a "slight" but "imperceptible" effect on the temperature in the condo. Mitchell continued: "I understand that the temps are over 100 so I'm going to give

_____

[2] Mitchell responded to her own email ten minutes later to correct a typographical error: "Excuse my typo, I meant 75 degrees."

it through the weekend and see if the unit cools any better." The next day, July 20, Mitchell emailed Danna again, stating that "[t]he temperature isn't going below 77 degrees. Since matters are worse not better, please advise how you want to handle this." Danna responded on July 29, stating, "I am sorry to hear the issue has not been resolved. I would advise contacting American Homeshield again." Mitchell replied, "Ok. I'll let you know what they say. Thanks."

At Mitchell's request, American Homeshield hired Service One Air Conditioning and Heating to repair the air conditioning unit. A technician from Service One was dispatched to the condo on July 30. He reported that the unit needed a new evaporator coil. American Homeshield authorized a new evaporator coil and scheduled its installation for August 8. When a technician came to install the evaporator coil, he diagnosed a new problem: the unit's compressor was also failing. American Homeshield authorized the installation of a compressor and the repair was rescheduled to August 16. The unit worked for four days before failing again. On August 24, Mitchell emailed the Bismars that "the AC isn't working again." Mitchell stated that she had contacted Service One and scheduled an appointment. Danna responded the same day and said, "I just confirmed the work order, they will call you before coming up." On August 28, Mitchell reported to Danna that "Service One came out this morning and fixed the second leaking coil." She said that Service One's "owner" told her that he was sure the unit was now fixed. But the unit was still malfunctioning and new problems arose. On August 30, Danna wrote to

Mitchell, "Can't believe they still have not been able to fix the AC properly, what was going on with it this morning?" Mitchell responded on August 31 that, according to Service One, "the auto shutoff wasn't working properly and kept shutting down the ac."

On September 2, 2018, Mitchell emailed the Bismars stating her intent to use a different company for the repairs as Service One "seems to be incompetent." Mitchell followed up on September 4, informing the Bismars that she had hired a different company, Countrywide AC, to investigate the problems with the air conditioning unit. Danna responded that, because the unit is covered under the American Homeshield policy, "we are fine with another contractor conducting the repairs as long as it is approved" by American Homeshield. That evening, Mitchell replied that, according to Countrywide, Service One installed the wrong compressor in the air conditioning unit. Mitchell also complained that "[g]oing through [American Homeshield] will add another week to the repair" because repair parts must be ordered from one of American Homeshield's approved vendors. Danna responded that if Countrywide could "fix the problem for a few hundred dollars ($200-300) that is fine; however, if it is more than that we cannot pay that amount and we will have to refer you again to [American Homeshield]." Danna said that she filed a complaint with American Homeshield and the case has been "'escalated' in their system." On September 5, Mitchell emailed the Bismars again expressing frustration with American Homeshield: "The lease and Texas law require repairs to

be made in a timely manner. 51 days to repair the air conditioning in the summer is not reasonable or ok. . . . But for [American Homeshield] and its contractors the ac would have been fixed in July." Mitchell also said that she had spoken with Service One and scheduled another appointment, making this their seventh or eighth attempt at fixing the unit. On September 7, Service One installed a new compressor, but that still did not fix the issue.

From September to October 2018, Mitchell worked directly with Service One to repair the unit. In text messages with Service One's owner, identified only as "Alan" in our record, Mitchell complained that Service One was at fault for her air conditioning unit being inoperable. Mitchell said she planned to hire a different company to install a new air conditioning unit and would forward the invoice to Service One. Ultimately, Service One agreed to, and on October 11 did, install a new unit at no cost.

On March 1, 2019, Danna emailed Mitchell regarding renewal of the lease. Danna said that the "rent will be increasing to $2,275/month" from the then-current $2,200 monthly rent. Mitchell responded the same day and said, "yes, I would like to renew the lease. I will follow up this weekend with more information." On March 12, 2019, Mitchell responded with a two-page email detailing the history of her attempts to have the air conditioning unit repaired. Mitchell also asserted that her resulting "costs/damages" were at least $4,015.38. In an attachment to that email, Mitchell broke down her costs and damages as follows: (1) $1,500 for the diminished

value of her property for 3 months valued at $500 per month; (2) $600 for the time she spent performing the duties of a property manager valued at $150 per month; (3) $1,200 for the time she spent performing duties of an attorney, which was at least four hours billed at a discounted rate of $300 per hour; (4) $515.38 for a bed cooling pad; and (5) $200 in estimated wear and tear on her portable air conditioning unit.[3] In light of these damages, Mitchell "propose[d] a lease renewal for two years at a monthly rate of $2,033." The closing paragraphs of the email stated:

> I tried to avoid too much legalese, but please be aware: This is an offer of settlement and is subject to revocation or change and may be submitted as future evidence of a settlement offer. If this offer is rejected and additional legal remedies are pursued, I will seek to recover attorneys' fees, court costs and the maximum amount of damages. Further, for purposes of clarity, I still intend to renew the lease and this settlement offer does not constitute a counter offer or rejection to your lease renewal offer on March 1, 2019.

> I sincerely hope that we can resolve this matter equitably and quickly without either party incurring additional expenses. I look forward to a smooth tenancy moving forward and during the next term of the lease.

On March 13, 2019, the Bismars, through counsel, sent Mitchell a notice of residential lease termination. The letter stated, in relevant part:

> I am in receipt of your e-mail dated March 12, 2019 in which you rejected the renewal lease terms proposed by my clients. This shall serve as written notice of a full and complete revocation of that offer as well as a rejection of the counter-offer set forth in your e-mail.

> Pursuant to Section 4 of the Residential Lease, your lease term shall expire on May 13, 2018 [*sic*] which is 60 days from the date of this

---

[3] Mitchell also listed several additional costs and expenses but explained that she intentionally omitted these items from total for the purpose of settlement negotiations.

Notice. Your prorated rent for May will be $922.58. See Section 4(B)(2).[4]

On October 7, 2019, Mitchell filed the instant lawsuit against the Bismars, asserting causes of action for breach of contract and violations of Texas Property Code sections 92.056 (failure to repair) and 92.331 (retaliation). The Bismars filed an answer generally denying Mitchell's allegations. The Bismars also filed a counterclaim which, after two amendments, asserted causes of action for declaratory judgment, violation of Texas Property Code section 92.334 (bad-faith complaint), and breach of fiduciary duty.

On July 1, 2020, the Bismars filed a hybrid traditional and no-evidence motion for summary judgment against Mitchell on all her claims. On September 2, 2020, Mitchell filed a traditional motion for summary judgment seeking judgment on her own claims. Mitchell's traditional motion also included a motion for sanctions against the Bismars and their trial counsel pursuant to Chapter 10 of the Civil Practice and Remedies Code and Texas Rule of Civil Procedure 13. On September 9, Mitchell filed a no-evidence motion for summary judgment against the Bismars on all their claims. In separate orders entered on October 1 and November 13, 2020, the trial court respectively denied the Bismars' motion and partially granted Mitchell's traditional motion. The November 13 order granting Mitchell's motion

---

[4] The primary term of the lease expired May 4, 2019, and lease automatically renewed unless written notice of termination was provided. The written notice of termination providing for 60 days' notice and pro rata rent calculated was not disputed.

included the following language: "All relief not expressly granted in this Judgment is hereby DENIED. This is a final order and finally disposes of the above-captioned case." The Bismars thereafter filed a motion for new trial, which was denied by operation of law. This appeal followed.

## DISCUSSION

In three issues, the Bismars challenge the trial court's grant of Mitchell's (1) traditional motion for summary judgment on her claims for breach of contract and retaliation; (2) traditional motion for summary judgment on her claim for violations of the Texas Property Code; and (3) motion for sanctions.

## I. STANDARD OF REVIEW AND SUMMARY JUDGMENT STANDARD

We review summary judgments de novo. *Riner v. Neumann*, 353 S.W.3d 312, 314 (Tex. App.—Dallas 2011, no pet.). When a party moves for summary judgment on its own claim, it must conclusively establish every necessary element in its favor. *Id.* A matter is conclusively established by the evidence if ordinary minds could not differ as to the conclusion to be drawn from the evidence. *Id.* We must take the evidence favorable to the nonmovant as true and draw every reasonable inference from the evidence in favor of the nonmovant. *Id.*

## II. ANALYSIS

### A. Breach of Contract

In her petition, Mitchell asserted her claim for breach of contract under two theories. First, she alleged that the Bismars violated the lease during the initial term

by failing to repair her air conditioning unit. Second, she alleged that the Bismars breached the lease by prematurely terminating it after the parties agreed to a renewal. A successful breach of contract claim requires proof of the following elements: (1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of that breach. *Cadillac Bar W. End Real Estate v. Landry's Restaurants, Inc.*, 399 S.W.3d 703, 705 (Tex. App.—Dallas 2013, pet. denied).

We begin with the repair issue. The lease includes a notice that "Subchapter B, Chapter 92, Property Code governs repair obligations." The applicable provisions of the Property Code apply only to conditions that "materially affect[] the physical health or safety of an ordinary tenant." *See* TEX. PROP. CODE ANN. § 92.052(a)(3)(A). For all other conditions, we look to the lease to determine the Bismars' repair obligations. *See id.* § 92.006 (providing that parties to a lease agreement to shift the cost of repairs subject to Subchapter B); *Churchill Forge, Inc. v. Brown*, 61 S.W.3d 368, 372–73 (Tex. 2001) ("[T]he Property Code not only permits the parties to contract over who will pay for repairs when the tenant causes damage, it specifically authorizes the parties to shift by contract costs of repairs for certain damages from the landlord to the tenant irrespective of whether the damage was caused by the tenant.").

The parties dispute whether Mitchell presented conclusive evidence that the failure of the air conditioning unit affected her physical health or safety. We need

–10–

not resolve the issue.[5] For purposes of this section, we assume the malfunctioning air conditioning unit did *not* affect Mitchell's health or safety. Under that assumption, the parties were free to "contract costs of repairs." *See Churchill Forge*, 61 S.W.3d at 372–73. Here, the only provision in the lease governing repair duties not covered by Chapter 92 of the Property Code is Paragraph 18, Subparagraph D. It provides that the Bismars "will pay to repair or remedy conditions in the Property in need of repair if Tenant complies with the procedures for requesting repairs as described in this Paragraph 18." The air conditioning unit is listed among the items subject to the previous sentence. Therefore, to prove breach of the lease for failure to make repairs not governed by the Property Code, Mitchell had to conclusively establish that the Bismars failed to "pay to repair or remedy" the air conditioning unit.

The summary judgment evidence shows that the Bismars maintained a warranty policy with American Homeshield. In his deposition, Hisham was asked whether he or Danna called American Homeshield after Mitchell informed them of the problem with the unit. He responded that "[u]sually we do" and he believed they did in this case. Emails show that the majority of expenses related to the repairs were paid by American Homeshield pursuant to the warranty policy. The few times Mitchell incurred out-of-pocket expenses related to the repairs, emails in the record

---

[5] If it did, then the Bismars' repair obligations were governed by the Property Code, which we will address in the next section as to Mitchell's independent claim.

show that the Bismars reimbursed those expenses. Mitchell's March 12, 2019 email listing her costs and damages did not include any repair costs she incurred. On this record, we conclude that Mitchell failed to conclusively establish that the Bismars breached the repair provision of the lease governing conditions not covered by Chapter 92 of the Property Code.

We now address whether the Bismars breached the lease by prematurely terminating it after the parties agreed to a renewal term. The parties do not dispute that Danna's March 1, 2019 email constituted an offer to renew the lease. They disagree about whether Mitchell accepted the offer or rejected it and made a counter-offer. It is well-established that an acceptance of an offer must be positive and unequivocal. *Austin Presbyterian Theological Seminary v. Moorman*, 391 S.W.2d 717, 720 (Tex. 1965). "Under the common law, an acceptance may not change or qualify the material terms of the offer, and an attempt to do so results in a counteroffer rather than acceptance." *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 513–14 (Tex. 2014). However, "the materiality of the altered term is key, and an immaterial variation between the offer and acceptance will not prevent the formation of an enforceable agreement." *Id.* "A contractual provision dealing with payment is always an essential element or a material term." *Davis v. Tex. Farm Bureau Ins.*, 470 S.W.3d 97, 104 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

Here, Mitchell responded to the March 1 email the same day, stating that "yes, I would like to renew the lease" and that she would "follow up this weekend with more information." Mitchell argues that this email constitutes an acceptance of the Bismars' offer. For the purposes of summary judgment, we disagree that as a matter of law Mitchell's email was a positive and unequivocal acceptance of the terms of the Bismars' offer. *See Wiggins*, 882 S.W.2d at 10; *see also Angelou v. African Overseas Union*, 33 S.W.3d 269, 278 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (whether contract was formed is a question of fact where meeting of the minds is contested and there is no "clear and definite acceptance of all terms contained in the offer"). We reach the same conclusion regarding Mitchell's follow-up email on March 12. In that email, Mitchell proposed monthly rent at $2,033 per month, down from $2,275 per month as offered by the Bismars. Later in the email, Mitchell stated that she "still intend[ed] to renew the lease and this settlement offer does not constitute a counter offer or rejection of your lease renewal offer on March 1, 2019." As with her March 1 email, Mitchell's statement, "I still intend to renew the lease," as a matter of law, does not constitute a clear and definite intent to be bound according to the terms of the Bismars' offer.

We conclude that there are genuine issues of material fact as to whether (1) the Bismars breached the provision of the lease requiring them to pay for repairs not governed by Chapter 92 of the Property Code; and (2) Mitchell and the Bismars entered into an agreement to renew the lease. We sustain the Bismars' sub-issues

–13–

related to Mitchell's breach of contract claim and reverse the trial court's grant of summary judgment as to that claim.

## B.     Violation of Property Code § 92.052

The Bismars next assert that the trial court erred in granting summary judgment on Mitchell's claim for violations of section 92.056 of the Texas Property Code. That section imposes liability on a landlord if:

(1)     the tenant has given the landlord notice to repair or remedy a condition by giving that notice to the person to whom or to the place where the tenant's rent is normally paid;

(2)     the condition materially affects the physical health or safety of an ordinary tenant;

(3)     the tenant has given the landlord a subsequent written notice to repair or remedy the condition after a reasonable time to repair or remedy the condition following the notice given under Subdivision (1) or the tenant has given the notice under Subdivision (1) by sending that notice by certified mail, return receipt requested, by registered mail, or by another form of mail that allows tracking of delivery from the United States Postal Service or a private delivery service;

(4)     the landlord has had a reasonable time to repair or remedy the condition after the landlord received the tenant's notice under Subdivision (1) and, if applicable, the tenant's subsequent notice under Subdivision (3);

(5)     the landlord has not made a diligent effort to repair or remedy the condition after the landlord received the tenant's notice under Subdivision (1) and, if applicable, the tenant's notice under Subdivision (3); and

(6)     the tenant was not delinquent in the payment of rent at the time any notice required by this subsection was given.

–14–

TEX. PROP. CODE ANN. § 92.056. Section 92.056 "does not require that the landlord *successfully* repair or remedy a materially harmful condition, [but] it does require a 'diligent effort.'" *Hamaker v. Newman*, No. 02-19-00405-CV, 2022 WL 714554, at *13 (Tex. App.—Fort Worth Mar. 10, 2022, no pet.) (mem. op.) (emphasis added).

To be entitled to summary judgment on this claim, Mitchell had to conclusively establish every statutory element listed above. In their summary judgment response, the Bismars asserted that Mitchell failed to conclusively establish the second and fifth elements. We do not address the second element because our resolution of the fifth element is dispositive. Mitchell informed the Bismars about the problems with the air conditioning unit at 9:25 p.m. on July 16, 2018, and Danna responded at 6:29 a.m. and 7:40 a.m. the next morning. In the latter email, Danna referenced the American Homeshield policy and directed Mitchell to schedule an appointment with them. Hisham testified that this was their routine practice for repairs as tenants are in a better position to schedule entry of a technician into their home. The A-US Air technician arrived on July 18 and injected coolant into the unit. Mitchell was charged $70, which the Bismars reimbursed through a personal payment app the same day. When Service One diagnosed the problem as a leaking evaporator coil on July 31, Mitchell was charged $580. Again, she was reimbursed the next day. Danna also called American Homeshield for an update and obtained an estimate for the repairs. The problems persisted over the next three months, with the air conditioner working intermittently. For example, on August 8

Mitchell reported that "ac is still not repaired"; after the compressor was installed, Mitchell reported on August 21 that "so far the AC is working great!"

Ordinarily, whether a party exercised diligence is a question of fact.[6] *See, e.g.*, *LaTouche v. Perry Homes, LLC*, 606 S.W.3d 878, 884 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (diligence in discovering injury ordinarily question of fact); *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52 (Tex. 2015) (same for diligence required to discover fraud related to oil and gas lease); *Erickson v. Heim-Hall*, 172 S.W.3d 664, 665 (Tex. App.—San Antonio 2005, no pet.) (same for diligence required to timely file medical malpractice suit). This case is no exception. On this record, whether the Bismars exercised diligence is a question of fact.

We sustain the Bismars' sub-issues related to Mitchell's statutory failure-to-repair claim and reverse the trial court's grant of summary judgment as to that claim.

## C. Violation of Property Code § 92.331

In their second issue, the Bismars assert that the trial court erred in granting summary judgment on Mitchell's claim for retaliation under Property Code section 92.331. That section provides, in relevant part:

---

[6] We have found only one court to have considered, on summary judgment, a landlord's diligence under section 92.056 is *Gioffredi v. Retreat at Riverstone*, No. 01-21-00627-CV, 2022 WL 17981570, at *10 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, no pet. h.) (mem. op.). There, the tenant complained of issues with his pipes, which took several visits from technicians and nearly a year to complete. *See id.* at *1. The landlord sought traditional summary judgment that it *was* diligent (i.e., conclusively negating the diligence element of the tenant's claim). The landlord supported its motion with documentation of "its ongoing communications and efforts to remedy the pipe condition within days of receiving [the tenant's] complaints." *Id.* at *11. In the absence of contrary evidence from the tenant, the court upheld summary judgment in the landlord's favor. The case before us is distinguishable from that of our sister court, which we are not bound to follow.

(a) A landlord may not retaliate against a tenant by taking an action described by Subsection (b) because the tenant:

    (1)  in good faith exercises or attempts to exercise against a landlord a right or remedy granted to the tenant by lease, municipal ordinance, or federal or state statute;

       . . . .

(b) A landlord may not, within six months after the date of the tenant's action under Subsection (a), retaliate against the tenant by:

       . . . .

    (4)  increasing the tenant's rent or terminating the tenant's lease;

Here, Mitchell asserted in her petition that the Bismars violated section 92.331 by "revoking the Lease contract renewal offer and terminating [Mitchell's] Lease early." To the extent Mitchell's retaliation claim is predicated on the Bismars' revocation of the lease offer, we conclude summary judgment was improper as a matter of law. Section 92.331 prohibits only the retaliatory conduct in subsection (b), and revocation of an offer of renewal is not among them. *See id.* To the extent that Mitchell's retaliation claim is predicated on the Bismars' termination of the lease agreement, summary judgment was still improper. As we explained above, the record reveals genuine issues of material fact regarding the lease renewal.

We sustain the Bismars' second issue and reverse summary judgment on the retaliation claim.

### D.    Sanctions

Regarding the third issue, we note that the trial court's final summary judgment was entered using a proposed order prepared by Mitchell. However, the

trial court struck through the language granting Mitchell's requested sanctions. The Bismars acknowledge that the sanctions language was stricken but point out that the following language still remains: "[Mitchell] is entitled to Summary Judgment as a matter of law on the issues expressly set out in the motion[.]" The Bismars therefore address the issue "in an abundance of caution." Mitchell responds that the issue is not before us because, by striking through the sanctions language, the trial court denied her motion for sanctions.

We agree that the trial court denied Mitchell's motion for sanctions. When a trial court strikes through language in a proposed order, it evinces an intent to deny relief on the issue raised by that language. *See Grace v. Titanium Electrode Products, Inc.*, 227 S.W.3d 293, 296 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (trial court intended to deny award of attorney's fees by striking through language in proposed order granting such relief); *Cox v. Upjohn Co.*, 913 S.W.2d 225, 228 (Tex. App.—Dallas 1995, no writ) (trial court intended to limit its summary-judgment ruling to grounds stated in its previous order when it struck through language in final judgment adding an additional ground).

We further conclude the trial court's denial of the motion for sanctions is not affected by the language in the order granting summary judgment "on the issues expressly set out in the motion." Under Rule 166a, a plaintiff can move for summary judgment on a claim, counterclaim, cross-claim, or request for declaratory relief. *See* TEX. R. CIV. P. 166a. Moreover, a motion for sanctions requires an evidentiary

–18–

hearing, while a motion for summary judgment requires a summary hearing. *See Click v. Transp. Workers Union Local 556*, No. 05-15-00796-CV, 2016 WL 4239473, at *2 (Tex. App.—Dallas Aug. 10, 2016, no pet.) (mem. op.) ("Chapter 10 and rule 13 require the trial court to hold an evidentiary hearing to make the necessary factual determinations about the motives and credibility of the person signing the allegedly groundless pleading."); *Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 269 (Tex. 1992) (explaining that Rule 166a precludes evidentiary hearing for summary-judgment motions). A motion for summary judgment is therefore not a proper vehicle through which to request sanctions, and the trial court could not have ruled on the motion for sanctions as a summary-judgment issue.

We overrule the Bismars' third issue as moot.

## CONCLUSION

We reverse the portion of the trial court's order granting summary judgment in Mitchell's favor on her claims for breach of contract and violations of the Texas Property Code.[7] In all other respects, we affirm the trial court's judgment.

/Bonnie Lee Goldstein/
BONNIE LEE GOLDSTEIN
JUSTICE

210104F.P05

---

[7] We do not address Mitchell's assertion on appeal that she is entitled to an award of statutory damages. Mitchell did not file a notice of cross-appeal raising this issue, and we therefore have no jurisdiction to consider it. *See* TEX. R. APP. P. 25.1(c); *PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 715 (Tex. App.—Dallas 2011, pet. denied) (court of appeals lack jurisdiction over untimely cross-appeal).



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

HISHAM BISMAR, DIMA
BISMAR, AND DANNA BISMAR,
Appellant

No. 05-21-00104-CV          V.

RUTH J. MITCHELL, Appellee

On Appeal from the 193rd Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-19-16320.
Opinion delivered by Justice
Goldstein. Justices Partida-Kipness
and Reichek participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** that portion of the trial court's judgment granting summary judgment in appellee's favor on her claims for breach of contract and violations of the Texas Property Code. In all other respects, the trial court's judgment is **AFFIRMED**. We **REMAND** this cause to the trial court for further proceedings consistent with the Court's opinion of this date.

It is **ORDERED** that appellant HISHAM BISMAR, DIMA BISMAR, AND DANNA BISMAR recover their costs of this appeal from appellee RUTH J. MITCHELL.

Judgment entered this 27th day of January 2023.