

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00111-CV

_____

PRO HEALTH, LLC, Appellant

V.

ELITE JET SOLUTIONS, LLC, Appellee

On Appeal from the 48th District Court
Tarrant County, Texas
Trial Court No. 048-316499-20

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Chief Justice Sudderth

**MEMORANDUM OPINION**

The parties dispute whether their brokerage agreement (Agreement) requires Appellant Pro Health, LLC to pay a commission to Appellee Elite Jet Solutions, LLC. Elite claims that it does, so it sued Pro Health for breach of contract, and the parties filed competing motions for summary judgment that turned on the Agreement's interpretation. The trial court concluded that a specific provision of the Agreement— a provision requiring payment of a commission for sales to certain buyers that occur within 90 days after the Agreement's termination—unambiguously requires Pro Health to pay a commission, and in the court's letter ruling, it detailed its interpretation of the 90-day provision.

Pro Health challenges that interpretation in its sole issue on appeal, highlighting the ways in which it is inconsistent with the remainder of the Agreement and pointing out that the trial court's written explanation conspicuously adds commas that materially affect the 90-day provision's meaning.

The trial court's addition of dispositive commas was indeed erroneous. The temptation to commit such an error is understandable, though, given the incoherence of the 90-day provision. Because the provision lacks a clear and definite meaning, its ambiguity precluded summary judgment. We will reverse and remand.

## I. Background

The parties' Agreement gives Elite the exclusive right to sell an aircraft owned by Pro Health, while Pro Health agrees to pay Elite a specified commission if one of

several triggering events occurs. Most of the triggering events are limited to the duration of the Agreement, with one exception for sales to certain buyers that occur within 90 days after the Agreement's termination.

Specifically, the 90-day provision requires "Owner [to] pay Broker the . . . commission in the event of . . . any sale of the Aircraft within ninety (90) days after termination of this Agreement to anyone with whom Broker or his agent or representative of the undersigned have negotiated with during the period of this Agreement." "Owner" is defined as Pro Health and "Broker" as Elite.

These defined labels are used to reference the parties not only in the 90-day provision but also throughout the remainder of the Agreement. Even when a provision references both entities, the Agreement generally lists them separately by their defined labels—"Owner and Broker" or "Owner or Broker"—with only a handful of references to "[e]ither party" or "the parties." Meanwhile, the term "undersigned"—though used in the 90-day provision—is not defined or used anywhere else in the Agreement. Nor does anything else in the Agreement refer to an "agent" or "representative" of one of the parties.[1]

After signing this Agreement, several months passed without a sale, until Pro Health terminated the Agreement. Then, just days after termination, Pro Health sold

---

[1]The only reference to an "agent" is in the Agreement's statement that Pro Health is appointing Elite "as its sole agent to sell the aircraft." Nothing in the Agreement references Pro Health's agents or representatives acting on its behalf or Elite's agents or representatives acting on its behalf.

3

the aircraft to a third party with whom Pro Health had begun talking while the Agreement was still in effect. Elite had not been involved in those discussions.

Elite claimed that it was entitled to a commission for the sale, so it sued Pro Health for breach of contract, among other claims.[2] Both parties moved for traditional summary judgment on Elite's contract claim, each arguing that the Agreement unambiguously required judgment in its favor. The trial court granted summary judgment for Elite, and in its letter ruling explained:

> [S]ubsection (c) [i.e., the 90-day provision] . . . mandates payment if the "Broker[,] or his agent[,] or representative of the *undersigned* . . . negotiated" with the purchaser during the period of the Agreement (emphasis and punctuation added). The above sentence identifies the Broker, follows that up with the term "his," obviously referring to the Broker, and then uses the term "undersigned." The use of the term "undersigned" in the same sentence that twice identifies the Broker suggests that the term either refers to the Owner or both parties that have signed the Agreement.[3]

---

[2]Elite also sued Pro Health's owner, but it later nonsuited its claims against him.

[3]Elite did not argue the interpretation or theory of liability adopted by the trial court. Rather, it moved for traditional summary judgment based on its allegations that (1) Pro Health had anticipatorily breached by intentionally delaying the finalization of its sale until the Agreement was no longer in effect; and (2) Pro Health sold the aircraft within 90 days after termination to a party represented by a broker that Elite had engaged in discussions with during the term of the Agreement.

Even after the trial court expressly stated the legal theory on which it was granting summary judgment, Elite did not deviate. When Pro Health moved for reconsideration of the summary judgment (and argued, among other things, that Elite had not moved for summary judgment on the theory sustained by the trial court), Elite responded by "incorporat[ing] its Motion for Partial Summary Judgment."

Because Pro Health was included in this interpretation of the term "undersigned," and because it had begun talking with the buyer while the Agreement was still in effect, the trial court concluded that the 90-day provision required Pro Health to pay Elite a commission for the sale. It subsequently entered a final judgment that incorporated its summary judgment, and it awarded Elite attorney's fees and costs.

Pro Health appeals, challenging the trial court's interpretation of the 90-day provision and the summary judgment premised upon that interpretation.

## II. Standard of Review and Governing Law

We review a summary judgment de novo. *Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 218 (Tex. 2022); *Parker Cnty. Appraisal Dist. v. Bosque Disposal Sys., LLC*, 506 S.W.3d 665, 667 (Tex. App.—Fort Worth 2016), *aff'd*, 555 S.W.3d 92 (Tex. 2018). Because the trial court granted summary judgment on specific grounds, we focus our review on those grounds.[4] *See Cincinnati Life Ins. Co.*, 927 S.W.2d at 626; *Parker Cnty. Appraisal Dist.*, 506 S.W.3d at 668.

---

On appeal, Elite continues to advance its summary judgment arguments—the arguments not ruled upon by the trial court—as the primary bases allegedly entitling it to the commission.

Regardless, Pro Health does not raise this issue on appeal.

[4]While we must review the specific grounds that the trial court ruled upon, we may also, in the interest of judicial economy, consider other summary judgment

5

Here, the grounds ruled upon turn on the language of the Agreement, which the parties agree is unambiguous. Even when parties consider a contract unambiguous, though, the presence of ambiguity and the interpretation of a contract are questions of law, which we review de novo. *Devon Energy Prod. Co., L.P. v. Sheppard*, 668 S.W.3d 332, 343 (Tex. 2023); *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018) (noting that "[a] contract . . . may be ambiguous even though the parties agree it is not"); *Nat'l Union Fire Ins. Co. of Pittsburgh v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) ("Whether a contract is ambiguous is a question of law for the court to decide.").

When interpreting a contract, our "primary objective . . . is to ascertain and give effect to the parties' intent as expressed in the instrument." *U.S. Polyco, Inc. v. Tex.*

---

grounds preserved for review. *See Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625–26 (Tex. 1996).

To preserve for appellate review summary judgment grounds that the trial court did not rule upon, "the party must raise them in the summary judgment proceeding and present them in an issue or cross-point on appeal." *Parker Cnty. Appraisal Dist.*, 506 S.W.3d at 668. Pro Health's brief does not analyze the grounds on which it unsuccessfully moved for summary judgment. And although Elite's brief addresses alternate summary judgment grounds that the trial court did not rule upon, it does not present these grounds as cross points.

Regardless, even if Elite had presented its alternate grounds as cross points, we would exercise our discretion not to address them because we lack the benefit of the trial court's decision or of full briefing on the issues. *See Cincinnati Life Ins. Co.*, 927 S.W.2d at 626 (holding that appellate court "may" consider alternate grounds but declining to do so without "the benefit of the court of appeals' decision on the merits of the . . . alternate grounds or full briefing from the parties").

6

*Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 387 (Tex. 2023) (internal quotation marks omitted) (quoting *URI*, 543 S.W.3d at 763). We "'presume parties intend what the words of their contract say' and interpret contract language according to its 'plain, ordinary, and generally accepted meaning.'" *URI*, 543 S.W.3d at 764 (first quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010); and then quoting *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)); *see Rosetta Res. Operating*, 645 S.W.3d at 219 (similar). We seek to harmonize the entire contract, avoiding constructions that would render any words or provisions meaningless. *See Rosetta Res. Operating*, 645 S.W.3d at 219; *Gilbert Tex. Constr.*, 327 S.W.3d at 126.

If a contract "can be given a definite or certain legal meaning," then it is unambiguous and must be enforced as written. *URI*, 543 S.W.3d at 765; *see Gilbert Tex. Constr.*, 327 S.W.3d at 133; *Heritage Res., Inc.*, 939 S.W.2d at 121. But if a contract "is susceptible to more than one reasonable interpretation . . . , an ambiguity exists," and "the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue." *Rosetta Res. Operating*, 645 S.W.3d at 219 (quoting *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983)); *URI*, 543 S.W.3d at 765.

### III.  90-Day Provision

The 90-day provision is a grammatical headache. It states:

Owner will pay Broker the aforementioned commission in the event of . . . any sale of the Aircraft within ninety (90) days after termination of this Agreement to anyone with whom Broker or his agent or representative of the undersigned have negotiated with during the period of this Agreement.

There is no dispute that there was a "sale of the Aircraft within ninety (90) days after termination of th[e] Agreement." That much is simple. The difficulty comes in deciphering who qualifies as a commission-triggering buyer: "anyone with whom Broker or his agent or representative of the undersigned have negotiated with during the period of this Agreement."

We must give effect to all words in this provision so that no word is rendered meaningless. *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015) ("We strive to give effect to all of the words and provisions so that none is rendered meaningless."). And to do so, we presume that the different terms used in the provision—"Owner," "Broker," "agent," "representative," and "undersigned"—were intended to have different meanings.[5] *See Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004) (construing insurance policy, commenting that "the different wording in the[ relevant] exclusions [wa]s significant," and concluding that because "policy used different wording—'arising out of' versus 'due to' in parallel exclusions— . . . the phrases should have different meanings"); *Mr. W Fireworks, Inc. v.*

---

[5]This is not to say that two words can never have the same meaning. *Cf. 1701 Com. Acquisition, LLC v. Macquarie US Trading, LLC*, No. 02-21-00333-CV, 2022 WL 3904976, at *20 (Tex. App.—Fort Worth Aug. 31, 2022, no pet.) (mem. op.) (noting that "different words can carry the same meaning").

*Ozuna*, No. 04-08-00820-CV, 2009 WL 3464856, at *7 (Tex. App.—San Antonio Oct. 28, 2009, pet. denied) (mem. op. on reh'g) (construing leases and "assum[ing] that because the parties used the word 'terminate' three other times in the leases, but instead chose to use the word 'void' when discussing the illegalization of the sale of fireworks, the parties meant 'void' to mean something different from 'terminate'"). The meanings of "Owner" and "Broker" are, of course, defined (and used plentifully) in the Agreement. The meaning of "his agent or representative of the undersigned," though, is fuzzy.

For starters, what is to be made of the word "his"? Although its placement implies that it refers to "Broker," "Broker" is defined as Elite, which is an entity—an "it." There are no human males mentioned earlier in the 90-day provision to which "his" could refer back.

Even if we assume that "his" attempts to refer to "Broker," the scope of what it modifies is unclear. Does the word modify both "agent" and "representative," or just "agent"? And for that matter, does the phrase "of the undersigned" modify both "agent" and "representative" or just "representative"? *Cf. Sullivan v. Abraham*, 488 S.W.3d 294, 296–98 (Tex. 2016) (interpreting statute authorizing award of "court costs, reasonable attorney's fees, and other expenses . . . as justice and equity may require," and noting that series-qualifier canon of construction[6] would apply justice-

---

[6]The series-qualifier canon provides that "[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or

9

and-equity modifier to court costs and attorney's fees but last-antecedent canon[7] would not).

As Pro Health highlights, the trial court attempted to make sense of these modifiers by adding commas, converting the relevant phrase to "Broker[,] or his agent[,] or representative of the undersigned." [Emphasis removed.] But "[p]unctuation is a[n] . . . indicator of meaning." *Id.* (quoting Scalia & Garner, *supra*, at 161); *see Criswell v. Eur. Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990) (op. on reh'g) ("Punctuation aids in construing the words used in the instrument."). Although punctuation does not always alter a sentence's construction,[8] a comma's placement can, in certain circumstances, determine the reach of a modifying term or phrase. *Sullivan*, 488 S.W.3d at 297–98 (noting that a comma's placement can

---

postpositive modifier normally applies to the entire series." *Sullivan*, 488 S.W.3d at 297 (quoting Antonin Scalia & Bryan A. Garner, Reading Law: the Interpretation of Legal Texts 147 (2012)).

[7]The last-antecedent canon provides that a qualifying phrase "must be confined to the words and phrases immediately preceding it to which it may, without impairing the meaning of the sentence, be applied." *Id.* (quoting *Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 580 (Tex. 2000)).

[8]*Compare Anderson & Kerr Drilling Co. v. Bruhlmeyer*, 136 S.W.2d 800, 803–04 (Tex. [Comm'n Op.] 1940) (stating rule that "[t]he words, not the punctuation, are the controlling guide in construing a contract" and that a court "may insert [a] comma, in order to ascertain from the words used the intention of the parties"), *with Criswell*, 792 S.W.2d at 948 (noting that, while "it is well settled that the words contained in the instrument, and not the punctuation, should be the controlling guide in construing the instrument, there is no rule which requires courts to disregard all punctuation and look solely to the language of the instrument" and discussing significance of semicolon in contract).

10

"determine whether a modifying phrase or clause applies to all that preceded it or only to a part" (quoting Scalia & Garner, *supra*, at 161)); *see U.S. Polyco*, 681 S.W.3d at 388 (noting that "comma's absence" was "instructive" in contract interpretation). And the 90-day provision is a prime example of this, as the trial court's placement of commas was the determinative factor that elected between competing reasonable interpretations.

Adding Oxford commas in the trial court's chosen locations—"Broker[,] or his agent[,] or representative of the undersigned"—limited the modifier "his" to "agent," and in doing so, implicitly disconnected the "representative of the undersigned" from the "Broker." With this in mind, the trial court concluded that the term "undersigned" refers to either "the Owner or both parties that ha[d] signed the Agreement," so Pro Health owed a commission for selling to a buyer that it had negotiated with during the term of the Agreement.

Placing the commas elsewhere would have changed this result entirely, though. For example, had the trial court placed commas after "Broker" and "representative"—such that the 90-day provision applied to buyers "with whom Broker[,] or his agent or representative[,] of the undersigned have negotiated"—then "his" would have modified both "agent" and "representative," and "the undersigned" would have clearly referred to Pro Health, for which Elite served as "Broker." With this comma placement, the universe of commission-triggering buyers would have been unambiguously limited to those with whom Broker (or his agent or

11

representative) had negotiated, meaning that Pro Health's negotiations with the eventual buyer did not trigger a commission.[9]

The material effect of the trial court's comma placement is precisely why it could not add such punctuation to the contract. *See Sundown Energy LP v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 889 (Tex. 2021) ("As we have said time and again, courts may not rewrite a contract under the guise of interpretation."). The absence of commas in the 90-day provision leaves both of these reasonable interpretations (and more) open as possibilities. The trial court could not select among reasonable interpretations by adding commas in its preferred locations.

Yet, even adding commas would not—and did not—entirely solve the problem. Because "undersigned" is undefined, we presume that the parties intended its ordinary meaning: "one whose name is signed at the end of a document." *Undersigned*, Merriam-Webster, https://www.merriam-webster.com/dictionary/undersigned (last visited April 15, 2024); *see Undersigned*, Webster's Third New International Dictionary 2490 (reprt. 2021) (1961) (defining undersigned as "one who signs his name at the end of a document"); *cf. RSUI Indem. Co.*, 466 S.W.3d at 118 (noting that, unless the contract dictates otherwise, "we give

---

[9]Further reshuffling the commas could change the meaning again. Had the 90-day provision been modified to apply to a buyer "with whom Broker[,] or his agent or representative of the undersigned[,] have negotiated," then "representative of the undersigned" would have been implicitly connected to "Broker." Whatever the meaning of "representative of the undersigned" in this context, its linkage to "Broker" would exclude Pro Health from its scope.

words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage"). Pro Health and Elite are the entities who "signed at the end of [the] document." *Undersigned*, Merriam-Webster, https://www.merriam-webster.com/dictionary/undersigned (last visited April 15, 2024). But those entities have defined labels—labels employed throughout the remainder of the Agreement—and the defined labels are not used in the portion of the 90-day provision that we must construe here. Generally, we presume that "using different language in different parts of a contract means the parties intended different things." *Sundown Energy*, 622 S.W.3d at 888; *see PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 708 (Tex. App.—Dallas 2011, pet. denied) (similar); *Mr. W Fireworks*, 2009 WL 3464856, at *7 (applying rule).

The references to an "agent" and a "representative" are also puzzling. Elite and Pro Health are both entities and can only act through agents or representatives. *See Ex parte Chambers*, 898 S.W.2d 257, 260 (Tex. 1995) (orig. proceeding) ("Although a corporation is a legally distinct and cognizable entity, it is only able to act through its agents."); *see also* 19 C.J.S. *Corporations* § 547 (2024) ("A corporation is an entity which can only act through it[s] agents."). The Agreement generally takes this as a given; outside of the 90-day provision, it consistently refers to the "Owner" (Pro Health) or the "Broker" (Elite) acting, without mentioning that such actions are necessarily taken by the entities' agents or representatives. It is unclear why the 90-day provision distinguishes between entities and their "agent[s]" or "representative[s],"or why it

13

distinguishes between "agents" and "representatives" when nothing else in the Agreement does so.[10]

The 90-day provision's wording thus presents a quandary. The trial court's temptation to materially alter the provision's language is certainly understandable, but it was beyond its authority—and it is beyond ours—to take such action. The 90-day provision simply does not make sense in the context of the Agreement as a whole; it lacks a clear or definite meaning.[11] *See Gilbert Tex. Constr.*, 327 S.W.3d at 133 ("If a contract as written can be given a clear and definite legal meaning, then it is not ambiguous as a matter of law."). And because the provision is patently ambiguous on its face,[12] summary judgment was precluded. *See Rosetta Res. Operating*, 645 S.W.3d at 225 (holding that mineral lease was ambiguous, so summary judgment on contract

---

[10]Furthermore, if "undersigned" were construed to encompass Pro Health, then the 90-day provision would require payment of a commission if a "representative of [Pro Health]" had negotiated with the buyer, but not if Pro Health itself had negotiated with the buyer. This is not only an absurd result but also an absurd distinction, given that Pro Health can only act through its representatives or agents. *See Rosetta Res. Operating*, 645 S.W.3d at 219 ("We also avoid constructions of contract language that would lead to absurd results.").

[11]Although the parties' filings indicate that, at least at one time, they had a shared understanding of the 90-day provision's meaning, "[o]bjective manifestations of intent control[—]not 'what one side or the other alleges they intended to say but did not.'" *URI*, 543 S.W.3d at 763–64 (quoting *Gilbert Tex. Constr.*, 327 S.W.3d at 127).

[12]"A patent ambiguity is evident on the face of the contract" and is contrasted with a latent ambiguity, which "arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter." *Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 520.

14

claim was improper); *Hoyt v. Harbor Lakes Homeowners Ass'n*, No. 02-20-00061-CV, 2021 WL 2966133, at *7 (Tex. App.—Fort Worth July 15, 2021, no pet.) (mem. op.) ("For a court to be able to construe a contract as a matter of law, the contract must be unambiguous.").

We sustain Pro Health's sole appellate issue.

## IV. Conclusion

The 90-day provision is ambiguous. The trial court erred by adding dispositive commas to it and by granting Elite's motion for traditional summary judgment based upon it. We reverse the summary judgment and remand the case for further proceedings consistent with this opinion. Tex. R. App. P. 43.2(d).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: April 18, 2024